Harry DUNN, Respondent,

v.

TERMINAL RAILROAD ASSOCIATION OF
ST. LOUIS, a corporation, Appellant.

No. 45721.

Supreme Court of Missouri,
Division No. 2.

March 10, 1958.

Warner Fuller, John P. Montrey, St. Louis, for appellant.

Mortimer A. Rosecan, St. Louis, Max C. Nelson, St. Louis, Charles E. Gray, St. Louis, for respondent.

LEEDY, Judge.

Action by Harry Dunn as plaintiff against Terminal Railroad Association of St. Louis, defendant, under the Federal Employers' Liability Act, 45 U.S.C.A. § 51 et seq., to recover damages for personal injuries. This is the second appeal. See Mo., 285 S.W.2d 701. There a judgment for $20,000 was reversed and the cause remanded for new trial because of improper argument of plaintiff's counsel. Upon retrial there was a unanimous verdict for plaintiff for $15,000, upon which judgment was entered, and defendant appealed.

There is no question as to the fact that plaintiff was injured while in the performance of his duties for defendant as foreman of a crew of mail and baggage handlers. The casualty occurred at defendant's Union Station in St. Louis on September 5, 1952. It is not claimed that plaintiff failed to make a case for the jury, and the nature of the errors that are assigned make it unnecessary to make an extended statement of the facts. For a more complete statement reference is made to the decision on the former appeal, supra. Plaintiff's evidence showed that he was directing his crew in the unloading of baggage from a train located on track 31. The baggage was unloaded onto baggage trucks or wagons known as bull trucks. Bull trucks are 4-wheel wagons, 3'7" wide and 10'3" long. They are equipped with standard automobile tires. They have a tongue on the front and a "U" hitch on the back, so that two trucks may be coupled together. The tongue is counterbalanced so that when not coupled to another truck it swings into an upright position. To uncouple a metal pin is removed from the "U" hitch and the tongue loop.

Plaintiff needed more bull trucks to complete the unloading of the train. Defend-

ant's employe, Clubb, who was driving a tractor to which four empty bull trucks were coupled, passed along the platform between tracks 30 and 31 whereon plaintiff was working, and plaintiff signalled for him to stop, indicating that he desired two of the empty bull trucks. According to plaintiff's evidence, Clubb stopped, and he, plaintiff, went between the second and third of the standing trucks to unhook the coupling, and the moment he got his hand on the pin the trucks started moving forward. He took six or eight "cross steps," moving along with the trucks, trying to get the pin out of the hitch. The trucks gained speed and he continued to try to pull the pin. As he got the pin out, Clubb suddenly stopped, the tongue of the truck raised up, the two trucks came together, and plaintiff's leg was smashed between the two trucks. Defendant's version was that when plaintiff "hollered" and said he wanted some wagons, Clubb did not stop because his wagons were over the safety line (a "scribe line" or score mark in the concrete one foot inside the edge of the platform) and he was expecting a train to come in (G. M. & O. No. 5) on track 30; that he just kept going to get in the clear of track 30, and when he looked back to see if he had cleared the safety line he saw Dunn between the wagons. He thereupon stopped, but Dunn had apparently disconnected the coupling by that time, for the injury followed.

The first point urged is that plaintiff's instruction No. 1 was reversibly erroneous because it emasculated the essential requirement of proximate causation and allowed a recovery even though defendant's negligence was not a proximate cause of the injury. This contention is based upon that part of the instruction which submitted liability if defendant's negligence (in the particulars thereinabove specified) "directly and proximately, in whole or in part, contributed to cause" plaintiff's injury.

■ Defendant cites Moon v. St. Louis Transit Co., 247 Mo. 227, 152 S.W. 303, 305, and the two authorities on which that case is based, as directly governing this point. The Moon case held that instructions which used a formula substantially like that here challenged ("contributed to cause" or the like) violated the rule announced in Hof v. St. Louis Transit Co., 213 Mo. 445, 111 S.W. 1166, and Krehmeyer v. St. Louis Transit Co., 220 Mo. 639, 120 S.W. 78, and were reversibly erroneous. Each of these cases involved contributory negligence as a defense, and the effect upon that issue of the verbiage here challenged was one of the prime elements in the court's consideration of the question. But obviously in the case at bar we are not concerned with any such problem because, generally, under the Federal Act, 45 U.S. C.A. § 53, the contributory negligence of an employe is not a bar to recovery, but operates only to diminish the damages he may recover. Another view adopted in the cases cited was that many things may have contributed to the injury which were not stated in the petition or evidence, and there being nothing to prevent the jury from considering such "outside" causes, the phraseology was condemned. The history and effect of the Hof and Krehmeyer cases, supra, was reviewed by the St. Louis Court of Appeals in Bopp v. Standard Sanitary Mfg. Co., 221 Mo.App. 188, 299 S.W. 137, 140, and it was there pointed out that the Hof and Moon cases were divisional opinions, whereas the Krehmeyer case, which was bottomed on the Hof case, was decided in banc, and that the condemnation in the Krehmeyer case of the [220 Mo. 639, 120 S.W. 88] "contributed to cause" instruction did not receive a majority vote, but only the concurrences of three judges, with one concurring in result but on other grounds; the other three judges thought the Hof case had been improperly decided. Later, Division #2, which had decided the Hof case, in Evans v. Klusmeyer, 301 Mo. 352, 360, 256 S.W. 1036, 1038, without mentioning either of the foregoing cases, held an instruction which used the same formula ("contributed to cause") correctly declared the law, saying: "The phrase 'directly contributed to,' as used in the instruction,

cannot be reasonably construed as other than synonymous with proximate cause, by which we mean such a cause as operated to produce a particular consequence without the intervention of an independent cause, in the absence of which the injuries would not have been inflicted. * * * Thus construed, the phraseology of the instruction is not vague or misleading, and, having correctly declared the law under the evidence, it should have been given."

■ The Klusmeyer case was followed in the Bopp case, supra, Primmer v. American Car & Foundry Co., Mo.App., 20 S.W.2d 587, and Inland Valley Coal Co. v. Wells, Mo.App., 24 S.W.2d 208, and has been cited approvingly by this court as lately as Liles v. Associated Transports, 359 Mo. 87, 220 S.W.2d 36, 41, and Domitz v. Springfield Bottlers, 359 Mo. 412, 221 S.W.2d 831, 832. Inland Valley Coal Co. v. Wells, supra, 24 S.W.2d loc. cit. 210, correctly epitomizes the present concept of the law on this subject in these words: "[T]he rule is clearly recognized that a defendant may be held liable, even though the accident was not caused by his sole negligence, provided his negligence concurred with that of another, or with an act of God, or with an inanimate cause, so long as his own negligence became a part of the direct and proximate cause, though not the sole cause. The exception is that the concurrent cause must not be the negligent conduct of the plaintiff himself, or of some one for whose acts he is responsible, for in such an instance it is elementary that the issue of contributory negligence steps in and serves to preclude a recovery for any primary negligence of which the defendant may have been guilty. Hence it has come to be understood that, where the evidence shows no contributing cause for the injury save the fact of the plaintiff's own negligence, it is error to direct a finding for the plaintiff upon the theory that the defendant's negligence contributed to cause, rather than that it caused, the injury, unless the instruction is expressly limited and safeguarded so as to exclude the idea that the concurring negligence of both plaintiff and defendant would nevertheless warrant a recovery by the former from the latter. So we have recently held in Bopp v. Standard Sanitary Mfg. Co., 221 Mo.App. 188, 299 S.W. 137, and in Primmer v. American Car & Foundry Co., Mo.App., 20 S.W.2d 587, both of which were written upon the authority of Evans v. Klusmeyer, 301 Mo. 352, 256 S.W. 1036, and in both of which petitions for certiorari were denied by the Supreme Court." See, also, Warner v. Terminal R. Ass'n, 363 Mo. 1082, 257 S.W.2d 75, 82. The recent case of Marsh v. Heerlein, Mo., 299 S.W.2d 441, 445, is not out of harmony with this view. Under these authorities, defendant's challenge of plaintiff's instruction No. 1 is disallowed.

Numerous errors are assigned upon the opening and closing arguments of plaintiff's counsel. The first of these complains of an instance of misstating evidence. Counsel for plaintiff was ridiculing the reason assigned by Clubb for not stopping when signalled by Dunn, i. e., that his trucks were at that moment over the safety line, and he "was afraid of a G. M. & O. train coming in [on track 30] *when the G. M. & O. train was already here on track 32.*" The language we have italicized was objected to on the ground there was no such evidence in the case. The court stated it did not recall, whereupon plaintiff's counsel said, "Harry Dunn testified that the G. M. & O. was on track 32 at twelve-ten." Defendant's objection was renewed, and the court's ruling was: "I will have to overrule it. I don't recall the testimony, but Mr. Rosecan says there was such testimony. Have to leave it to the jury." Plaintiff's counsel then asked the jurors "to draw on your memory, gentlemen, whether the testimony shows that the G. M. & O. wasn't here on that track testified to by Harry Dunn at twelve-ten, and if it wasn't, if it wasn't, the Terminal Railroad Company could have brought in the records and shown that it wasn't. They haven't brought in any records to show when that G. M. & O. train got in." This

argument was objected to on the ground unfavorable inferences such as counsel was arguing should not be drawn against defendant for the nonproduction of such records. Plaintiff's counsel then interposed: "If the Court please, Harry Dunn says the G. M. & O. was in on track 32 at twelve-ten. The accident happened around twelve-twenty. Their witnesses, Clubb and McNalley, say they were afraid of the G. M. & O. coming in on track 30 when the evidence shows from Harry Dunn that the train was already in. Now, if they wanted to disprove that, if Harry Dunn is wrong in that, they have the telautographs." Defendant renewed its objection (that an inference should not be drawn against defendant for the nonproduction of telautograph records), which was overruled. Plaintiff's counsel continued: " * * * Their own telautograph records would show that at twelve aught five, the G. M. & O. was listed to come in on track 32." The court sustained defendant's objection to this argument, and instructed the jury to disregard it stating there was "no evidence telautograph records would show that." Plaintiff's counsel interposed the suggestion that he believed Harry Dunn so testified, but on defendant's objection to such statement, the court ruled, "Yes, sustained as to the telautograph record."

◼ We consider the misstating-of-evidence assignment with the closely connected one bottomed upon the argument drawing an inference against defendant for the nonproduction of its telautograph records. Plaintiff's counsel frankly admit that the statement made in argument to the effect that plaintiff had testified that the G. M. & O. train had come in at 12:10 on track 32 was incorrect. It is said that such misstatement was not committed intentionally, but arose because of confusion created by the two trials of the case. In substantiation of this, we are referred to the record on the former appeal where it was stipulated that the telautograph records showed that on the occasion in question the G. M. & O. train No. 5 "was scheduled to arrive

on track 30, but that was changed to track 32, where it did arrive at 12:10 A.M., on the morning of September 5, 1952. In other words, instead of arriving on track 30, as originally scheduled, it arrived on track 32 * * * at 12:10." In view of this stipulation, even though made at the former trial, we are unwilling to say that counsel's supposed portrayal of plaintiff's testimony in the respects challenged was deliberately done in the absence of any foundation upon which to base the ultimate fact sought to be argued. But the drawing of inferences against defendant because of the nonproduction of the telautograph records was, we think, not warranted. However, in view of the opportunity defendant's counsel had to answer that argument, and the sustention of the objection as to what the records would show, and the court's admonition to the jury to disregard the statement as to what the latter showed, we are not prepared to say the trial court abused its discretion in overruling these grounds of the motion for new trial.

◼ The next objection goes to another instance of plaintiff allegedly misquoting, in his closing argument, an extrajudicial statement said to have been made by plaintiff to defendant's agent Hardaway. It would serve no useful purpose to even excerpt the involved record upon which this objection rests. It is sufficient to say that the court finally sustained defendant's objection "as far as the argument goes to the statement." The defendant thus obtained a favorable ruling on its objection and asked no further relief, so we leave the matter where we find it.

Considerable time was spent by counsel on both sides in arguing the merits of plaintiff's extrajudicial statement and certain intricacies connected with it. Defendant's counsel emphasized certain features which plaintiff's counsel undertook to minimize. An objection was sustained to the following statement of plaintiff's counsel: "Oh, gentlemen, if you are going to let the Terminal Railroad defeat claims on the basis of statements that they take of their

injured employees who are hurt on their job under these circumstances, then I tell you, there isn't an injured employee that is going to receive—" Defendant's counsel then asked that plaintiff's counsel be rebuked, and the following occurred:

"Mr. Rosecan: Well, gentlemen, it will encourage the use of statements and the taking of statements of their injured people when they are out in the hospital if they can defeat claims based on those statements.

"Mr. Montrey: Make the same objection, Your Honor, please, improper argument and an improper inference drawn from the evidence in this case.

"The Court: Overruled as to that last argument."

Contrary to defendant's contention, we think the foregoing is not comparable to the "rotten, wormy, diseased apple" argument which was condemned on the former appeal.

■ The defendant next urges the impropriety of the following portion of plaintiff's closing argument: That if there was among their number someone who was "hardened to pain and suffering and calloused about it * * * then the nine of you who agree on the highest verdict can render that as the verdict of this jury." No objection was saved to the argument at the time it was made. We do not regard it as coming within the purview of 42 V.A.M.S. Rule 3.27, Supreme Court Rules, as defendant now urges, and in this situation we are not required to pass on the question.

■ The next complaint is directed against the following portion of plaintiff's counsel's argument: "And, gentlemen, don't worry about what happens to the verdict that you are going to render. Let me worry about it after that." The cases relied on by defendant are Buehler v. Festus Mercantile Co., 343 Mo. 139, 119 S.W.2d 961, 967, and Phillips v. Vrooman, Mo., 251 S.W.2d 626, 630. The condemnation of the similar argument made in those cases was for the

reason it was deemed to have injected the question of insurance into the case in view of the voir dire examinations, as a reading of both cases plainly shows. We think they are not in point, and inasmuch as there is nothing in the record remotely indicating that an insurance company or anyone other than the Terminal itself might be called upon to pay whatever judgment might be rendered, the point is disallowed.

Other objections to the argument have been preserved and urged on this appeal, but the foregoing are typical of the more serious ones. We have examined the others, and while some, if not all, are subject to some criticism, they are not of such gravity to justify individual treatment in this opinion, nor do any of them, singly or collectively, require reversal of the judgment.

Defendant's final point is that the jury's award of $15,000 is grossly excessive. Plaintiff's injury consisted of a comminuted fracture of the femur of the right leg. As disclosed by X-rays taken at the time of injury, there were six distinct breaks in the bone extending from approximately one inch above the knee to approximately four inches above the knee. There had been a puncture or punching in of the cortex or outer covering of the femur, leaving a V-shaped depression about a third of the depth of the bone—"the bone actually smashed inward and turned partially on end." Subsequent X-rays showed hypertrophic spurs on the patella, and that the indentation into the femur was permanent.

The evidence bearing on the issue now under scrutiny, when viewed in the light most favorable to plaintiff, was to the following effect: Plaintiff was 44 years of age at the time of trial. He started his employment with the Terminal in 1944 as a mail and baggage handler, and at the time of his injury had become a foreman. He had gone only to the fourth grade in an Arkansas elementary school. The nature of his employment during his adult life he described as "just mostly labor work." The injury occurred September 5, 1952, and he

was taken immediately to the hospital. Five or six days later a cast was applied. He stayed in the hospital three weeks, and then went on out-patient service, reporting back every two or three weeks. He continued to wear the cast until the first part of January, 1953, and then used two crutches until March 5.

He testified that after getting off the crutches, he could not do the kind of work his job with the Terminal required (such as climbing off and on trains and baggage cars, climbing up on bull trucks, and jumping off the various cars and trucks on the platforms), and in April, 1953, he went to work for his brother at a filling station where he was paid $65.10 for a 72-hour week (6 p. m. to 6 a. m., 12 hours, 6 days a week), contrasted with $135 to $145 every other week, his earnings at the Terminal for a 40-hour week. At the filling station he fills gas tanks, waits on autos, is able to change a tire if he uses a bumper jack, and does lubrications. If he stands on his feet for any period of time his leg bothers him quite a bit. He cannot bend the right knee like he does the left, and he cannot get down under a truck to jack it up in order to make a tire change, and must use a bumper jack. The right thigh is thinner than the left. He can bend his right knee back approximately 90 degrees. During weather changes his knee feels like a toothache. He walks with a limp. The pain in his leg interferes with his sleep. He cannot walk up steps like a normal person, and must take one step at a time, especially with a flight of steps.

Two physicians, testifying from their examinations of the plaintiff and from X-rays made at the time of hospitalization and subsequently, described the nature of the injury as hereinabove set forth. One of these, Dr. Robert Mueller, had examined plaintiff four times at intervals between November 13, 1952, and May 11, 1956, the latter date being ten days prior to the trial. He testified that upon the occasion of his last examination plaintiff's right knee could be moved approximately to a right angle; that measurements showed the right thigh just above the knee was approximately one inch smaller than the left; that there was some thickening of the soft tissues and also thickening of the bone at that point; the right thigh above the knee was very sensitive to touch; there was rather coarse crepitation noted in the right knee which was due to adhesions that had formed in the area; the atrophy in the right thigh was permanent. It was his opinion that plaintiff had reached maximum recovery and that he would have soreness and aching in the leg if he was on his feet for any length of time, or at any time he strains his knee a lot. This would vary with the weather, and what he does; that he did not think plaintiff could continue with a job of the type of work that required him to stand on his feet, this because of aching of various degrees which would be produced by the impairment of the motion in his knee; that plaintiff would be uncomfortable a lot of the time in work which required standing on his feet or moving the knee.

Dr. Leon Fox, an orthopedist, examined plaintiff on May 16, 1956, and, testifying from X-rays, stated that some taken long subsequent to the time of injury showed tiny spurs on the patella; that there was some irregularity of the under surface of the kneecap. Other X-rays also disclosed a thickening of the bone and a scalloped-out or crushed-in area. There was some spurring in the lower corner of the inner aspect of the thigh bone where the thigh bone comes into the knee joint which the witness described as an indication of arthritic changes occurring within the joint which were attributable to trauma, or the result of injury. There was 25 to 30 degrees less motion of the right leg than of the left, and there was a difference of about 10 per cent between the passive and active motions of the right leg; however, plaintiff was able to extend his knee completely; that as a result of the injuries the right thigh muscles had undergone atrophy; his limitation of flexion, that is, his inability to completely bend the knee is due to scar tissue that has occurred within the knee joint and the up-

per portion of the knee pouch, and also in the muscles that control the motions of the leg in extension. His right thigh measured 17¼ inches in circumference, and the left thigh measured 18 inches, because of atrophy or shrinkage of the thigh muscles. It was the opinion of this witness that plaintiff does not have normal knee mechanism and any extremity that has abnormal knee motion is going to produce pain if the person is on it, or walks on it for a long period of time; there was no surgical procedure which he could recommend which would improve plaintiff's condition. It was the doctor's opinion that plaintiff's condition was permanent, and that he would have trouble "particularly in getting off of things and kneeling and walking downstairs." It was developed on cross-examination that the alignment of the bone was suitable for weight-bearing purposes and there was no cartilage involved inside the knee itself.

Defendant's contention respecting the charge of excessiveness of the verdict is based on two cases, Turner v. Central Hardware Co., 353 Mo. 1182, 186 S.W.2d 603, 610, 158 A.L.R. 1402, and Ciardullo v. Terminal R. Ass'n, Mo., 289 S.W.2d 96, both of which, defendant asserts, are comparable as regards the injury considered. We may say the Turner case seems to be somewhat more closely so than the Ciardullo case.

Turner, 57 years of age, earning $50 a week as a plant guard, sustained a comminuted fracture of the left tibia that extended into the knee joint and both sides were depressed. Surgery was required and the injury and treatment were painful. He was in a hospital five weeks, in a cast, then on crutches, and at the time of the trial used a cane. He had at least a 50 per cent permanent disability as regards the knee, and there was the likelihood of future trouble. There was a shortening of one inch in his left leg; the left knee and left ankle were larger in circumference than the right; there was also some lateral instability in the knee and permanent partial loss of flexion. Turner was away from his work from April 27, 1943, until October 18, 1943. His loss in wages and medical expenses amounted to $1850. There the verdict was for $15,000, and this court, comparing ages, earnings, medical expenses, the nature and extent of the injuries and losses, and the awards in then recently decided cases, required a remittitur to $10,000.

In Ciardullo v. Terminal R. Ass'n, supra, the plaintiff, a 30-year-old switchman, sustained a fracture at the head of the radius extending into the left elbow joint. He suffered a 35-degree loss of extension and a 10-degree loss of flexion in that arm, which was said to be permanent. He lost about four months from his employment, but returned to work as a switchman, although he worked with a painful condition in his arm. By remittitur this court reduced the verdict of $15,000 to $12,000.

While no two cases are precisely alike, we think that insofar as the Turner case is concerned, the fact that it was decided thirteen years ago and the sharp reduction in the value of the dollar since that time would seem to make it apparent that the sum here awarded is not, by comparison, disparate. The Ciardullo case is more recent, it having been decided April 9, 1956. The reduction there was from $15,000 to $12,000, but there is here present an element of damage not in that case, namely, permanent disability from resuming work in the same capacity as before the injury occurred. Ciardullo returned to his former employment as a switchman; the plaintiff here is disabled from so doing. Plaintiff's physical disability is such as to presently require 72 hours to earn substantially the same amount as was paid him for a 40-hour week—an increase of 80 per cent in working hours. Having taken into consideration the features governing the question of excessiveness of verdicts, we conclude that while the amount awarded is perhaps the maximum that should be permitted to stand, it is not, under the facts here involved, grossly excessive so as to require remittitur. The judgment is affirmed.

All concur.