Wilma SLATES, Respondent,

v.

JOPLIN BUTANE GAS CO., Inc., a
Corporation, et al., Appellants.

No. 46426.

Supreme Court of Missouri,
Division No. 1.

Sept. 8, 1958.

Bond, Bond & Buehner, Joplin, for appellants.

Gilbert Carter, Ewing, Ewing & Ewing, Nevada, for respondent.

VAN OSDOL, Commissioner.

Action by Wilma Slates, widow of Glenn Slates, deceased, for $25,000 damages for the wrongful death of her husband Glenn who was fatally burned in an explosion of propane gas when the husband attempted to light the burner of a water heater in the basement of the farmhouse occupied by the Slates in Jasper County.

It was the theory of plaintiff's case that defendants, Joplin Butane Gas Co., Inc., and Gayle Childress and Monte Taylor, respectively the president and secretary-treasurer of Gas Company, were negligent in failing to sufficiently odorize the gas as to indicate positively its presence, and in failing to warn or inform plaintiff and her husband of the characteristic of propane, which in its gaseous state is approximately one and one-half times heavier than air, to descend or settle in the lower portion of an enclosure. Defendants denied generally, and pleaded and submitted contributory negligence of plaintiff's decedent in carelessly installing an improper fitting or junction of the copper tubing, through which gas was conveyed to the water heater, with the thermostat housing. It was alleged and submitted that the nut, which was screwed on the thermostat housing, "and the copper tubing leading into same were not of the same size or within a reasonable tolerance calculated to produce a union or fitting which would prevent the leakage of gas." It was further alleged and submitted that plaintiff's decedent was negligent in failing to cut off the gas supply to the water heater, and to the line and system leading thereto, before attempting to relight the water heater when "he knew or should have known that there was a leak in the tubing and fitting leading to the said hot water heater and when he knew or should have known of the presence of a large quantity of gas in said basement * * *."

The jury returned a verdict for defendants, but the trial court granted plaintiff a new trial on the specified ground of error in giving defendants' Instruction No. 12. Defendants have appealed.

Herein, defendants-appellants contend the trial court erred in granting plaintiff a new trial. They do not contend plaintiff failed to show, prima facie, negligence of defendants as submitted, but they assert a verdict should have been directed for defendants on the ground plaintiff or her decedent or both were contributorily negligent as a matter of law; and defendants-appellants alternatively assert there was no prejudicial error in defendants' Instruction No. 12. Plaintiff-respondent contends that neither she nor her husband, as a matter of law, was guilty of contributory negligence; that, if there was negligence on their part, such negligence did not proximately or directly contribute to the fatal injury; and that the trial court erred in submitting the negligence of plaintiff or her decedent. But, plaintiff-respondent contends that, if the defense of contributory negligence was submissible, the issues of that defense were erroneously and prejudicially submitted by defendants' Instruction No. 12 and the trial court correctly granted plaintiff a new trial on the specified ground of error in that instruction. Plaintiff-respondent further contends the trial court erred in giving defendants' Instructions Nos. 13, 14, 15, 16 and 17.

Infra, we first shall examine the contention that negligence of plaintiff or her husband was, as a matter of law, a bar to plaintiff's recovery. But, in treating with this (and other contentions requiring the evidence to be analyzed from varying standpoints), it is necessary to make a rather extensive statement of the evidence relevant to these questions as introduced by both of the parties, plaintiff and defendants.

A gas-burning water heater was installed in the basement of the Slates' farmhouse December 27, 1955. The house faces east, the kitchen being at the southwest corner of the house. One enters the basement by descending a stairway leading from the kitchen. The basement is a small one— six feet nine inches wide, north-south, and eleven feet ten inches long, east-west— being in a "partial" excavation of earth from beneath the kitchen. The walls of the north and east sides of the basement are three and a half feet high, and there is a "crawl" space over the unexcavated earth in the area under the three other rooms of the house. The ceiling of the basement is seven feet three inches above the basement floor. There is a window approximately twenty-one inches wide and thirty-one inches high in the south wall of the basement, the window sill being fifty-seven inches from the basement floor. The water heater was set in the southwest corner of the basement about one foot out from the south wall, the thermostat of the heater being even with the west side of the window and about four feet below the window sill.

Before the water heater was installed, the Slates had used propane gas for cooking, and the husband Glenn in installing the water heater put a "T" fitting in the gas line (which passes in through the south foundation wall and had serviced the kitchen stove) and connected a three-eighths inch copper tubing at the "T" joint. The tubing extended down and was connected with the thermostat housing.

Defendants supplied bottled liquified propane to the Slates. On order, two bottles, metallic cylinders, of liquified propane were maintained on a base south of the house, just a little west of the basement window. A "cut off" appliance was provided so that the gas could be turned off ("at the bottle") outside the house.

When the water heater was installed it would overheat and the automatic control on the thermostat would not shut it off properly. January 8, 1956, the husband and one Donoho detached and worked on the original thermostat but were unable to correct the fault.

Donoho, witness for defendants, testified that he observed the copper tubing leading from the "T" joint to the thermostat and the fitting at the point where the tubing was connected with the thermostat housing. The connection consisted of a "flare" of the three-eighths inch copper tubing inserted into a half-inch ferrule nut which in turn was screwed to the thermostat housing. Donoho observed tape wrapped around the nut and tubing at their juncture. He testified that he told plaintiff's husband the end of the tube should have a ferrule on it, and the nut was not the right size—"I told him it couldn't possibly hold." After plaintiff's husband and Donoho reinstalled the original thermostat for temporary use, they again turned on the gas supply line "at the bottle," and Donoho held a lighted match near the connection at the thermostat housing to see if there was any leakage. "It burned out in three or four places around it. * * * It was like a pilot light." Another witness for defendants testified a three-eighths inch tubing could not be "flared" or "ferruled" sufficiently to accommodate a half-inch nut and make a gastight or airtight connection —"I would say it would be impossible, Sir." However, a witness for plaintiff testified three-eighths tubing could be flared sufficiently to "take care of the half inch" nut, and that he had made such an adequate connection as an experiment.

After the husband and Donoho had failed to repair the original thermostat, another thermostat was ordered and was installed January 14th. It could be inferred the husband reinstalled the three-eighths inch copper tubing and the half-inch nut connection with the housing of the new thermostat. Plaintiff testified the water heater equipped with the new thermostat operated satisfactorily until February 21st, except the pilot light blew out occasionally when the basement window was open.

It was stipulated by the parties, plaintiff and defendants, that the thermostat was so designed "that, when operating properly, the gas supply to the heater from the gas supply line leading to the heater will be terminated or cut off by the thermostat * * * whenever the pilot light * * * goes out or is turned off," and that such operation of the thermostat "when the pilot light goes out or is turned off, will not have the effect of reducing the available gas supply to the heater by the gas supply line * * * or of reducing * * * the pressure of the gas in said supply line * * *."

Plaintiff testified that she had done the family laundry in the morning of February 21, 1956. About noon she noticed the water was not hot, but thought the heater had not "caught up" or the pilot light had gone out. When her husband came home from work at four-fifteen in the afternoon, plaintiff went to the basement. She opened the "little door" of the heater; saw the pilot light was out; and sensed "there was a faint, well, it was like ether I would say * * * it was like knowing something was there and not being sure about it. * * * It felt like a breeze would when it touches your face, and one moment it is there and the next moment, is gone." When she went upstairs she felt a little bit nauseated and sick. She told her husband that the pilot light was out, and that she thought there was "some gas down there." The husband went to the basement; turned off the manual control at the top of the thermostat; and opened the basement window. The Slates then went to look at a farm they were thinking of buying, and got back home at "I would say approximately 5:30." Plaintiff went to the basement to get some vegetables for supper. She "sniffed" and didn't smell any gas in the basement then. She didn't light the pilot light, however; she thought she would "just leave it alone a little while, and if there was any gas left, that it would go on out." Before serving the evening meal, plaintiff prepared a sandwich for her husband, and then asked him to go down and light the heater. Having eaten the sandwich, the husband obtained a match and went to the basement. Plaintiff cautioned the husband to be careful—"And

he said, well, if he smelled any gas he wasn't about to light a match to light the hot water heater." In a minute or a minute and a half or two plaintiff heard and saw "a big flash of fire come out through the basement door * * *."

Although fatally burned, the husband managed to get to the basement window, and plaintiff was able to lift him through the window. Standing without the window, the husband exclaimed, "'I would have sworn all that gas was out of there.'" The husband was hospitalized, but died at about nine the following morning, February 22d.

There was evidence that propane in a gaseous state is invisible and is one and one-half times heavier than air. It has the characteristic of initially settling in a gaseous stratum in the lower part of an enclosure. Walking through a gas-permeated enclosure tends to "stir up" the gas, and if there is an aperture the circulation of air will tend to diffuse the gas. It is highly flammable and explosive, and is said to be properly odorized when its presence is detectable down to one-fifth of the lower limit of flammability. Ethyl mercaptan is a recognized odorizing or "stenching" agent. One pound of ethyl mercaptan "per 10,000 gallon tank car" is considered adequate.

Plaintiff testified that both she and her husband had the normal sense of smell.

We shall have occasion to state more of the evidence in the further course of this opinion.

Attending now the contention that plaintiff or her husband was guilty of contributory negligence as a matter of law— we note that plaintiff believed gas had escaped and was present in the basement when she was in the basement at approximately four-fifteen in the afternoon; that she advised her husband that the pilot light was out; and that she thought there "was some gas down there." The husband turned off the thermostat by means of

the manual control and opened the basement window; but the evidence compels the inference that the husband did not cut off the supply of the gas "at the bottle." The husband apparently assumed the escaping gas came through the vent in the pilot light fixture, the pilot light having become extinguished. We remember there was evidence tending to show that the Slates had experienced difficulty with the thermostat originally installed on the water heater, and it may be the husband supposed the thermostat more recently installed was not operating properly. Although it was stipulated by the parties that the thermostat automatically turned off the gas supply at the water heater when the pilot light was turned off or went out, this was subject to the qualification that the thermostat was "operating properly." Now there was evidence introduced that thermostats not infrequently "get out of fix," and require servicing or repair. And, if plaintiff's testimony is given credence, the pilot light was out and gas was, nevertheless, escaping through the little door of the water heater. The evidence tending to show that the connection (at the juncture of the copper tubing with the thermostat housing) was an improper connection was introduced by defendants. Even though it were assumed the connection was an improper one, there was no evidence introduced which compelled the inferences that any gas was escaping through the connection before or after the new thermostat was installed, or that plaintiff or her husband knew or should have known gas was escaping through the connection, if it was.

We bear in mind that contributory negligence is a jury question, unless it may be said from all the evidence and the reasonable inferences therefrom viewed in the light most favorable to plaintiff, the only reasonable conclusion is that plaintiff was negligent and that his negligence was a proximate cause of his injury. Creech v. Riss & Co., Mo.Sup., 285 S.W.2d 554. Contributory negligence as a matter

of law can seldom be established by oral testimony offered solely by defendant. Usually it must appear in plaintiff's case or be established by testimony on the part of defendant which plaintiff concedes to be true, or by documentary evidence or proof of facts or circumstances by defendant which leave room for no other reasonable inferences. State ex rel. Thompson v. Shain, 349 Mo. 1075, 163 S.W.2d 967; Knight v. Richey, 363 Mo. 293, 250 S.W.2d 972.

Although plaintiff's husband did not cut off the gas supply at the source of the gas "at the bottle" outside the house, we note the evidence that when plaintiff and her husband returned to their home at approximately five-thirty in the afternoon plaintiff went to the basement and did not smell gas. At the time she did not attempt to relight the heater, but she later requested her husband to do so and cautioned him to be careful. The husband indicated that he would not strike a match to relight the heater if he smelled escaping gas. The fact that within a minute or so thereafter he did strike a match is substantial in supporting the inference that he did not smell escaped gas. We have also noted his exclamation (after he had been lifted out through the basement window) that he would have sworn " 'all that gas was out of there.' "

■ We think a jury would be justified in concluding, in the factual situation here, that one who had turned off the thermostat and opened the basement window with the view of cutting off the source of and dissipating the escaped gas and, upon returning an hour or more later, experienced no odor indicating the presence of gas could reasonably assume that turning off the thermostat and opening the window had shut off the source of and dissipated the gas, even though he had not turned off the gas "at the bottle." It would seem that one in the exercise of ordinary care might reasonably rely on the assumption that the gas supplied by defendants was odorized

in accordance with their duty, and, having detected no odor could reasonably assume no gas remained in the basement in flammable quantity. We believe it should not be said that plaintiff's husband, as a matter of law, was not exercising ordinary care for his own safety in these circumstances in attempting to relight the heater (or that plaintiff was negligent in requesting or permitting him to do so).

In Winkler v. Macon Gas Co., 361 Mo. 1017, 238 S.W.2d 386, plaintiff Marjorie had been told by Mrs. Alvord that some gas had been escaping in the basement of the Itschner house. About two hours later plaintiff Marjorie and her husband, plaintiff Harold, went to the basement and attempted to light the water heater. An explosion followed. Both plaintiff Marjorie and her husband testified they did not smell gas when they went to the basement. This court ruled adversely defendants' contention that, since plaintiff Marjorie had been forewarned of escaping gas, she was guilty of contributory negligence as a matter of law.

■ With respect to plaintiff-respondent's contention that the evidence did not justify the submission of contributory negligence of the husband (the trial court did not submit negligence of plaintiff wife)— this contention is considered by reviewing the evidence from the standpoint most favorable to defendants.

■ The jury was not obliged to believe plaintiff's testimony tending to show that, when she went to the basement at four-fifteen, gas was escaping from the pilot light; but the jury was, nevertheless, justified in believing from plaintiff's own testimony, indeed, plaintiff was bound by her own testimony, that at that time she believed gas was present in the basement, and so advised her husband. Of course, the jury could disbelieve plaintiff's testimony and refuse to indulge the inference that, after the Slates had returned from inspecting the farm at approximately five-

thirty, no odor of escaping gas was discernible in the basement. It was stipulated that the thermostat automatically shut off the gas at the heater when the pilot light was extinguished, and, if a jury chose to disbelieve plaintiff's testimony tending to show gas had been escaping through the water heater, a jury reasonably could infer the gas was escaping through the ill-fitting connection of the copper tubing with the thermostat housing; that the husband knew or should have known the connection was one through which gas was likely to escape (according to Donoho's testimony the husband had been cautioned that such a connection "couldn't possibly hold"); and that negligence in installing a gas line with such a connection (or in lighting a match in the basement knowing of the presence of gas) was a cause, and a direct efficient or producing cause, that is, a proximate cause of the husband's fatal injury.

As stated, the trial court granted plaintiff a new trial on the ground of error in giving defendants' Instruction No. 12. Specifically, the trial court stated as the ground for the order that " * * * Instruction No. 12 was erroneous in requiring the jury to find only that the deceased made an improper connection to the thermostat and made no requirement that the jury find that the improper fitting actually leaked and contributed to the death of the deceased."

Instruction No. 12, given at defendants' request, was, as follows,

"The Court instructs the jury that the law requires that Glenn Slates exercise ordinary care for his own safety in matters pertaining to the installation and use of the hot water heater and propane gas mentioned in evidence, that is, such care, caution and prudence, as a reasonably prudent person would use under the same or similar circumstances; therefore, if you find and believe from all the evidence in this case, that Glenn Slates failed to exercise ordinary care for his own

safety in matters pertaining to the installation of the hot water heater and the use of the propane gas mentioned in the evidence in either one or more of the following particulars:

"(1) By making an improper connection to the water heater, in that the nut which was screwed onto the pipe fitting in the thermostat housing of the hot water heater and the copper tubing leading into same were not of the same size or within a reasonable tolerance calculated to produce a union or fitting which would prevent the leakage of gas, or:

"(2) By failing to cut off the gas supply to the hot water heater and to the line and system leading thereto, before attempting to re-light the heater and in striking a match to so do, when he knew or should have known that there was a leak in the tubing and fitting leading to the said hot water heater and when he knew or should have known of the presence of a large quantity of gas in said basement, and if you further find that such failure to exercise ordinary care for his own safety, if you so find, contributed to cause his injuries and death, then you should find that Glenn Slates was guilty of contributory negligence and your verdict must be for the defendants * * *."

It will be seen that paragraph (1) hypothesized an improper connection to the water heater in that the copper tubing and the nut which were utilized in making the connection were not of the same size or within a reasonable tolerance to make union or fitting which would prevent the leakage of gas, and neither in that paragraph nor elsewhere in the instruction is a finding required that gas actually *leaked* through or that the escape of gas was due to the unorthodox or improper juncture of the nut and copper tubing of unequal size. Even though it were found that the connection was made by improper or im-

provised fittings and that the husband was negligent in installing the connection, the finding of causal contributory negligence was not justified except for the further finding that, due to the improper connection, gas leaked or escaped therefrom. In examining paragraph (2) we note that negligence of the plaintiff husband was submitted in failing to cut off the gas supply before attempting to relight the heater and in striking a match to so do, "when he knew or should have known that there was a leak in the tubing and fitting * * * and when he knew or should have known of the presence of a large quantity of gas in said basement * * *." We believe it is plainly to be seen that in paragraph (2) a finding of the fact of a leak or the escape of gas from the "improper" fitting was not submitted, but the fact was assumed; likewise, paragraph (2) assumed that the husband "knew or should have known of the presence of a large quantity of gas in said basement." These facts were not conceded, but were essential to a finding of contributory negligence of the husband.

Defendants-appellants have cited Higgins v. Terminal R. R. Ass'n of St. Louis, 362 Mo. 264, 241 S.W.2d 380, in urging there was no prejudicial error in failing to hypothesize that the gas fitting leaked. In the Higgins case it was essential to plaintiff's recovery and there was substantial evidence that the water on the floor upon which plaintiff stepped came from the leaky radiator. Plaintiff's principal verdict-directing instruction (No. 1) did not precisely hypothesize the fact, although the instruction submitted "that said radiator leaked, and caused water to leak" on the floor. But in that case there was no evidence that the water on the floor came from a source other than the leaky radiator. In our case there was evidence from which it could be reasonably inferred that gas had escaped through the extinguished pilot light fixture. Moreover, in the Higgins case defendant's Instruction No. 4 directed a verdict for defendant unless the jury found, inter alia,

that water was on the floor which had come from the leaky radiator.

We are of the opinion the instruction (No. 12) was prejudicially erroneous in omitting the hypotheses and submission of facts essential to defendants' defense of contributory negligence. The trial court did not err in granting plaintiff a new trial on the specified ground.

We also note that Instruction No. 12 hypothesized the essential element of causation in paragraph (2) in such a way that the instruction is obscure in including the application of the requirement of a finding of this essential element to the facts as submitted in paragraph (1); and that the phrase "contributed to cause his injuries" (or the word "cause") is not modified by the word "directly" or "proximately" or by a similar word. As a rule it is safer that an instruction submitting the issue of contributory negligence should direct in substance and effect that if the jury finds plaintiff was contributorily negligent as specifically submitted and that such negligence of plaintiff directly (or proximately) contributed to cause his injury, he cannot recover. Stumpf v. Panhandle Eastern Pipeline Co., 354 Mo. 208, 189 S.W.2d 223, 228, and authorities cited therein. This is because proximate causation is ordinarily a jury question. Although there is an exception to the rule, if an instruction on contributory negligence requires the finding of negligent conduct which, in the nature of things, "necessarily contributed directly to cause the injury and necessarily formed a part of the efficient cause thereof, then the instruction cannot be held erroneous because it does not require the jury to draw the inference which the law itself draws therefrom," that is, if the hypothesized negligent acts of plaintiff permit no reasonable inference but the inference that the negligence was a direct, producing or efficient cause of the casualty. Carr v. St. Joseph, Mo.Sup., 225 S.W. 922; Stumpf v. Panhandle Eastern Pipeline Co.,

**816**

supra; Knox v. Weathers, 363 Mo. 1167, 257 S.W.2d 912; Young v. Kansas City Public Service Co., Mo.Sup., 270 S.W.2d 788.

We think it is unnecessary to prolong this opinion by an examination of plaintiff-respondent's contentions that other instructions given at defendants' request were prejudicially erroneous; however, we have the view that counsel should examine these contentions carefully so that any apparent error in instructing the jury may be obviated upon retrial.

The trial court's order granting plaintiff a new trial should be affirmed.

It is so ordered.

COIL and HOLMAN, CC., concur.

PER CURIAM.

The foregoing opinion by VAN OSDOL, C., is adopted as the opinion of the court.

All of the Judges concur.