Charles GIAMBELLUCA, Plaintiff-Respondent,

v.

MISSOURI PACIFIC RAILROAD COMPANY, a Corporation, Defendant-Appellant.

No. 46503.

Supreme Court of Missouri,

Division No. 1.

Jan. 12, 1959.

Motion for Rehearing or to Transfer to Court en Banc Denied and Opinion Modified on Court's Own Motion Feb. 13, 1959

Thompson, Mitchell, Thompson & Douglas, J. Richard Skouby, Charles M. Spence, Richard P. Conerly, St. Louis, for appellant.

Everett Hullverson, Hullverson, Richardson, Hullverson & Jeans, D. L. McClure, St. Louis, for respondent.

VAN OSDOL, Commissioner.

Plaintiff Charles Giambelluca instituted this action against defendants Missouri Pacific, Union Pacific, and Texas & Pacific

railroad companies, for personal injuries sustained when the rack of an "auto loader" with automobile thereon fell upon plaintiff while he was assisting in unloading automobiles from T. & P. Car No. 62007 at Sugarland, Texas.

Plaintiff originally had declared on the theory of res ipsa loquitur, but during trial the petition was amended to allege specific negligence in failing to properly inspect the boxcar and auto loader so as to discover worn gears and loose bolts. Prior to trial, a motion to quash the return of service of summons on defendant Texas & Pacific Railroad Company had been sustained, and plaintiff's case was submitted to a jury as against the remaining defendants. The jury returned a verdict for plaintiff and against Missouri Pacific Railroad Company awarding $75,000 damages, but returned a verdict against plaintiff and in favor of Union Pacific Railroad Company. Defendant Missouri Pacific Railroad Company has appealed.

Plaintiff was the employee of E. A. De Late, an automobile dealer of Stafford, Texas. The automobiles, Pontiacs, in boxcar 62007 had been consigned to De Late by General Motors Corporation, Kansas City. The boxcar, although belonging to Texas & Pacific Railroad Company, had been supplied by defendant Missouri Pacific. According to defendants' evidence the boxcar and auto loader had been inspected and tagged "O.K. for auto loading" by employees of Missouri Pacific. The boxcar was then delivered to defendant Union Pacific for the switching movement to the tracks at the General Motors plant. Four Pontiacs were loaded in the boxcar by General Motors—two on the floor, one at each end of the boxcar, and two resting above them on the auto loaders, one loader and elevated automobile thereon at each end of the boxcar. The boxcar then was moved by several carriers to a side track of the Texas & New Orleans Railroad Company at Sugarland, Texas, where the automobiles were to be received by consignee De Late.

An auto loader, such as involved herein, is operated by a hoisting device, integral part of the loader, mounted on a steel shaft running across the end of the boxcar near the ceiling. Metal drums accommodating steel cables are on and pinned to each end of the shaft. The shaft passes through the hoisting device proper which is near the right-hand corner as one faces the end of the boxcar. The gear mechanism of the hoisting device is enclosed in a metal housing. Passing through the housing, the steel shaft is keyed to a bronze hob gear a little less than seven inches in diameter. The cogs of the hob gear are designed to mesh with the worm threading of a steel worm gear below which is in an horizontal position and is borne by bearings in each (front and rear) side of the gear housing.

At the rear side of the housing the shaft of the worm gear "slip fits" through a gear plate and, extending farther, is pinned or fixed in the hub of a sprocket wheel. An endless chain fifteen or twenty feet long passes over the sprocket wheel and meshes in accommodating corrugations in the outer periphery of the wheel. The gear plate at the rear side of the housing is fixed to the housing by four hexagonal-headed ¾" stud bolts or "cap screws." Attached to and a part of the gear-plate casting and extending downwardly at an inverted V-angle are cast-iron arms terminating in guides just outside the lower right and left of the sprocket wheel at the points where the links of the chain engage with the corrugations on the periphery of the wheel.

Steel cables pass from the drums at either end of the shaft and are so routed through pulleys as to pass over and attach to the sides and evenly hoist or lower the weight of the rack and load, which rack consists of four metal plates framed together on which the wheels of the automobile rest. Four arms or bars, two on either side, attached to the sides of the rack extend up and are attached to or near the ceiling at the sides of the boxcar. These arms guide the rack in pendulum fashion as the rack is raised or lowered by the cables and hoist.

In loading, the rack with automobile is raised and swung somewhat more to the rear of the car, the front of the rack being finally brought to an elevated fixed position with rear end near the end of the boxcar and the front end tilted up so that another automobile may be stowed beneath. When the rack and automobile are in such position, two legs of adjustable length, pivoted on each side of the rack, are folded down and fixed to the floor of the boxcar by flanged clevis devices. Normally, during transit, these legs support, or at least in large part support, the rack and the automobile thereon.

In unloading the boxcar, the automobile on the floor is taken out first and the rack and automobile above are lowered by means of the hoist. In order to lower the rack, the legs beneath it must be removed. And as the rack is lowered it glides forward toward the center of the boxcar. In raising the rack, the operator of the hoist grasps and pulls the right-hand chain, that is, the chain as it hangs on the right hand as the operator stands facing the end of the boxcar; and, in lowering, the chain as it hangs on the left is used. Ordinarily, it takes five or six minutes to lower the rack and load.

There was evidence that the principle of mechanics on which the hoisting device works is that of friction, or braking action between the larger hob gear of comparatively soft bronze and the harder steel of the smaller worm gear. When the device is in normal condition, the worm gear operated by the chain and spocket can turn the hob gear and lift or lower the rack and load, but the weight (alone) of the loaded rack on the cables, drums and hob gear cannot turn the worm.

It is to be particularly noted that the cast-iron arms of the chain guides are cast as one casting with the gear plate. And if the four cap screws fixing the gear plate to the gear housing were sheared, while the hoisting device was being operated with loaded rack, the shaft of the worm gear could slip from its seats in the two bearings at the lower part of the housing; the thread-ing of the worm gear could become disengaged from the cogs of the hob gear; the weight of the automobile and rack could unwind the cables from the cable drums; and the rack and its load could fall to the floor of the boxcar.

Plaintiff's theory was that when boxcar 62007 was inspected by defendant Missouri Pacific the cap screws holding the gear plate to the gear housing were loose and the bronze hob gear was worn so that when the loaded rack started downward by one pull of the chain the sprocket wheel would suddenly revolve at such a rapid rate that the chain was likely to jam in its guides causing a sudden shearing of the cap screws and the load then to fall rapidly. Defendants' theory was that the hoist, not having a worn hob gear and having cap screws which were tight, could still be caused to shear if the operator pulled the lowering chain very hard, by which the chain could be caused to whip and jam with resulting severe impact on the cap screws themselves.

Defendant-appellant, Missouri Pacific Railroad Company (hereinafter referred to as "defendant," although the word "defendants" is often used when we are including defendant Union Pacific), assigns error of the trial court in refusing to grant defendant's motion for a directed verdict. It is contended (1) there was no substantial evidence from which the jury could find that the hob gear was worn and that the cap screws were loose; (2) plaintiff was bound by his own testimony that the hoist, and not the legs, was holding the weight of the loaded rack, which testimony shows that the hob gear was not worn and the cap screws were not loose when defendant inspected the hoist; and (3) plaintiff was, as a matter of law, contributorily negligent in being beneath the loaded rack when it fell. Other errors of the trial court are assigned (4) in giving plaintiff's verdict-directing Instruction No. 7; (5) in permitting plaintiff's counsel to ask hypothetical questions based on assumption of fact contrary to plaintiff's own testimony; and (6) in refusing to grant defendant's motion for

a mistrial because statements regarding defendant's failure to produce the hoisting device were prejudicial. It is also assigned (7) that the award, $75,000, was grossly excessive; and (8) that the trial court erred in refusing to rule that a prior action by De Late's workmen's compensation insurer against defendant Missouri Pacific and others barred plaintiff from recovering such amounts to which such insurer may have been entitled by subrogation.

■ The contentions challenging the submissibility of plaintiff's case require a further and extensive examination of the evidence. In ruling such contentions an appellate court considers the evidence in the light most favorable to plaintiff. The evidence favorable to plaintiff is considered as true, and plaintiff is given the benefit of every reasonable inference therefrom; and defendant's evidence unfavorable to plaintiff is disregarded.

■ In the instant case, no witness testified directly that the hob gear of the hoisting device was worn and that the cap screws of the gear plate were loose. Plaintiff in endeavoring to make out his case as alleged and submitted was relying principally on circumstantial evidence and the testimony of expert witnesses, and the opinion evidence introduced by defendant(s) often was in conflict with that of plaintiff. This does not necessarily mean there was no substantial evidence supporting the submission. The jury had the "right and function to find some of the facts, even some facts essential to plaintiff's case, by reasoning upon the evidence, even circumstantial evidence, and inferring from such evidence that a certain required thing or fact existed or was true." Hardwick v. Kansas City Gas Co., 355 Mo. 100, 195 S.W.2d 504, 508, 166 A.L.R. 556, and authorities therein cited. An expert witness is one who by reason of education or specialized experience possesses superior knowledge respecting a subject about which persons having no particular training are incapable of forming an accurate opinion

or of deducing correct conclusions. However, the expert's opinion, which the jury may accept, must not be a mere guess— it must be based upon facts and adequate data. Vitale v. Duerbeck, 338 Mo. 556, 92 S.W.2d 691; Waldron v. Skelly Oil Co., 363 Mo. 1146, 257 S.W.2d 615; Gaddy v. Skelly Oil Co., 364 Mo. 143, 259 S.W.2d 844. His "positive opinion must have to support it reasons and testimony which will give it sufficient probative force to be substantial evidence." Kimmie v. Terminal R. Ass'n of St. Louis, 334 Mo. 596, 66 S.W. 2d 561, 565. The facts upon which an expert's opinion is based, like the facts sufficient to support a verdict, must measure up to the legal requirements of substantiality and probative force and, upon appeal, the "question whether such opinion is based on and supported by sufficient facts or evidence to sustain the same is a question of law" for the appellate court. Hall v. Mercantile Trust Co., 332 Mo. 802, 59 S.W.2d 664; Ambruster v. Levitt Realty & Investment Co., 341 Mo. 364, 107 S.W.2d 74; Gaddy v. Skelly Oil Co., supra; Craddock v. Greenberg Mercantile Inc., Mo.Sup., 297 S.W.2d 541.

■ De Late, having been advised of the arrival at Sugarland of the automobiles consigned to him, sent his manager Rome, and four other employees—plaintiff Giambelluca, Stringfellow, Nulich and Lott— to Sugarland to unload the boxcar which had been set on an east-west side track with unloading platform north thereof. The Pontiac on the floor in the west end of the boxcar was unloaded, and De Late's employees including plaintiff were proceeding to unload the Pontiac borne above at the west end. There was varying testimony on whether the front legs under the rack supporting the automobile above had been removed before the lower automobile had been unloaded. Rome said none of the legs had been removed. Plaintiff said one of the front legs had been, and Stringfellow said it was necessary for both to be taken out. There was also some variance in the testimony of plaintiff's wit-

nesses as to whether the hoist had been used to raise the rack to enable the removal of the legs. Plaintiff testified that initially the legs were all loose, with the inference that the entire weight of the rack and automobile was theretofore supported by the hoist. Stringfellow testified the rack had been raised to remove the two front legs. Rome and Nulich both testified the rack was "resting on the legs" when the boxcar was opened and the hoist was used to raise the rack and take the pressure off the legs so they could be removed. Lott said he thought Nulich took one of the legs out; plaintiff took two out, and he, the witness, took one out. He said he didn't think they raised the rack to loosen the legs because it was "kind of loose." In any event, it was plaintiff's duty to remove one (or more) of the legs and to fold it up and attach it to the side of the rack.

Lott testified that, the legs having been removed, he "wretched it" or caught the chain of the hoist "and, well, when I caught it, well, it just went right on up and I just fell out, skinned my arm, around my neck. * * * Well, I caught it and started, you know, started down with it. Well, it just went right on up. I felt something fall and I just, you know, fell down, skinned my arm and up in my neck. * * * The car goes down when you pull the chain hoist block, it ain't going down until you pull the chain hoist, and you turn it loose, it be in good shape it ain't going to fall." If you turn the chain hoist loose, it "will stay right where it is * * * it will stop right there. * * * When I pull the chain on down, well, it just went all the way down at once, see." Rome said "the car just fell out of the sky, just like shooting a .45 out of a gun."

The four cap screws were sheared at the face of the gear housing, and the sheared-off ends had fallen to the floor. The sheared-off surfaces were "bright and shiny" and the "rest of these bolts" were "greasy and rusty." The evidence was in conflict as to the length of the sheared-off ends of the cap screws. Plaintiff's witnesses testified the sheared-off ends were from a half inch to an inch and a half long, and defendants' evidence tended to show that the sheared-off ends were three-eights of an inch in length, which was the very thickness of the gear plate. Plaintiff's evidence of the length of the sheared-off ends was the testimony of witnesses who, very soon after the casualty, had observed the screws but had made no actual measurements. Defendants' evidence consisted of testimony of witnesses who said they had measured the fragments and photographs purportedly of sheared-off parts. The sheared-off portions were not introduced. Defendants' evidence tended to show the sheared-off parts had been disposed of or destroyed by the station agent at Sugarland. The length of the sheared-off portions had evidentiary relevancy on the supporting factual issue of whether the cap screws were loose. The testimony of defendants' witnesses and the photographs purportedly showing the length of the sheared-off portions were not conclusive. The jury was privileged to believe the testimony of plaintiff's witnesses.

There was evidence tending to show that, after the casualty, the gear plate was thrust out and away from the gear housing. There was a U-shaped nick in a link of the chain, and a scratch on the metallic supporting plate on the wall of the boxcar near the right-hand chain guide.

The hoisting device had been in use about two years. Bronze, a soft metal, is subject to wear. If the rack and load dropped rapidly it would indicate there was an improper binding of these two gears. This could be due to a worn condition of the hob gear. Such a worn condition could be determined easily by the ease with which the hoist would go up and down. This test could be made by merely pulling the rack up and down with the chain. The tightness of the cap screws could be tested by the use of a wrench.

It was the opinion of an expert witness that the gears were so worn that they allowed the load to descend at such a rapid speed that the force and thrust on the worm gear was transmitted to the cap screws and the cap screws were sheared off. In rapidly descending the chain may whip around and a link become clogged in the chain guide, but if the apparatus is in proper working order and the gears are not worn the chain will not clog in the guide. It was the testimony of an expert, defendants' witness, that if the cap screws were tightened properly at Kansas City they would not loosen for a considerable length of time. They would not loosen in the journey from Kansas City to Sugarland. Another witness for defendants testified that "if you gave it (the down chain) a hard enough pull it (the rack) will * * * come half way down * * * maybe a quarter way down, according to the weight you have on it. * * * If I give that machinery a good pull and it. falls and breaks, we have a lot of explaining to do." No auto loader is geared to drop down. They are geared to hold.

Plaintiff's expert witness Bland was of the opinion that the hob gear was worn and the cap screws were loose. Specifically, the witness expressed his opinion as follows, "As I understand the question, the car was received sealed, that the strain was taken to ease up on the cable and immediately thereafter * * *. To have a sudden movement of the downward movement of the automobile platform would indicate only one thing to me, that is, that the gears were not meshing properly; that they were not performing as the basic concept is the two gears should move very slowly and one should not drive the other, therefore, they must be improperly operating, which I would attribute to wear. The platform drops quickly, as I understand your question. The chain, if the platform drops suddenly, the chain will immediately rise because the worm gear shaft is turning it, and then there is a loud snap – – something had to break – – if you found the bolts on the floor rather than the castings of the metal – – I would say the snap was the failure of the bolts. I would attribute the whole thing, one, to wear within the gear themselves, and, secondly, the bolts not in proper position – – they must have been withdrawn somewhat or the bolts would not have snapped."

This opinion was in answer to a hypothetical question which included the stipulated fact that the employees of General Motors had "found nothing wrong with said car or loading device therein" when they loaded the boxcar at Kansas City. The question also included the hypothesized facts that the "hoist was (initially) used only to take the weight off the legs (with the inference that the weight of the rack had theretofore rested on the legs)"; that, after the legs were taken off the floor and fastened to the rack, the order was given to lower the rack; "that Lott went to the chain and to lower the rack, gave it one pull, that it started rapidly to descend, that the chain jerked from him, moved rapidly, hitting him on the body, and immediately there was a loud pop and the bolts fell to the floor, and the automobile and rack crashed to the floor."

Defendant complains that the inclusion of the hypothesized fact that the rack and load were resting on the legs was in direct conflict with plaintiff's own testimony and urges the application of the general principle of those cases which observe that a party's testimony on the witness stand may be of such a nature as to have the effect of a judicial admission which not only relieves the opponent from adducing evidence but precludes the party himself from disputing it either by his own testimony or by other witnesses. See for example Burris v. Kansas City Public Service Co., Mo.App., 226 S.W.2d 743, referred to by this court in the case of Smith v. Siercks, Mo.Sup., 277 S.W.2d 521. It is true that plaintiff as a witness testi-

fied that when he and others were engaged in removing the legs from beneath the loader rack the legs were loose; but it is also true that in thus testifying he apparently was only inferring that the rack and loader theretofore had not been supported by the legs.

"Q. Didn't someone * * * in the crew have to raise or use the hoist * * * to raise that load before you could take – – A. No sir, nobody used those block and tackle chains – – those legs were loose.

"Q. You mean the load of the rack and its automobile burden was supported by the cables alone when it arrived there at (Sugarland) Houston? A. It must was – – because all those legs was loose."

While plaintiff's testimony as quoted is unequivocal, it is reasonable to suppose that the inference which his testimony projects (that is, that the rack and its load had not rested on the legs during transit) was due to mistake. We have noted the testimony of other witnesses that it was necessary to remove one or both of the front legs supporting the rack before the automobile on the floor in the west end of the boxcar was unloaded leaving room for the probability that the rack had been raised to ease the weight off of the legs even before the lower automobile at the west end was unloaded. Rome testified that "the first procedure the boys do" is to "take the pressure off of the legs." Several of the witnesses, plaintiff's and defendants', were in agreement that the rack and its load, regardless of whether or not the hob gear was worn, would have "settled" down on the legs during the journey from Kansas City to Sugarland, save and except for a mere possibility that at Kansas City the chain had been caught in the guide on the right arm of the gear plate. A witness for plaintiff said it would not take very long for the weight of the load to bear down on the legs where it would rest securely. Vibration sets in and causes it "to settle down." One leg could have been loose and another not. A witness for defendants testified—

"Q. Is that true – – the load would gradually go down until it got to the legs? A. I think it would.

"Q. It wouldn't take very long either, would it? A. No."

In this situation we think the testimony of plaintiff to the effect that the legs were loose when the boxcar was opened should not be held to the full effect of a judicial admission. It is reasonably apparent that plaintiff may not have been in a position to observe and know of all of the acts of his fellow employees preparatory to and during the work of unloading the boxcar; and the testimony of other witnesses, according to the evidence, seems more in harmony with physical laws.

Defendant argues the stipulated fact, which was included in the hypothetical question, that the employees of General Motors found nothing wrong with the boxcar and hoist conclusively shows the hob gear was not worn and the cap screws were not loose. Although plaintiff's expert, Bland, said the worn and loose conditions which permitted the rack and load to fall at Sugarland must have existed and were discoverable by the men loading the Pontiacs at Kansas City, he qualified this statement by saying that the stated conditions were discoverable at Kansas City if "the men were properly instructed and knew what to look for," and he further explained that the rack and load could have been raised at Kansas City and the locking action under "static friction" could very well hold long enough to get the legs under the rack and "it could slip off and ease off in a short time * * * it may stay for a time and then it may slip."

Defendant's contention that there was no evidence of rapid descent of the rack antecedent to the shearing of the cap screws is of no merit. The theories of both parties contemplated the rapid descent

of the rack as one of the physical causes of the shearing of the cap screws. Plaintiff, as stated, had the theory the rapid descent was due to the worn condition of the hob gear. Defendant's theory, as stated, was that the rapid descent of the rack was due to an unusually hard pull on the chain. However, plaintiff's evidence tended to negative defendant's theory that Lott pulled the chain unusually hard. Rome testified,

"Q. Now, what sort of a pull did Lott apply to the chain? A. Well, just like we generally proceed, sir, just come on down with it. That's the only thing we do. * * *

"Q. Now, did you watch Lawrence Lott start this lowering job? A. Yes sir, I did, sir.

"Q. And he did give a good pull on the down side? A. Just pulled, that's about all, because you can't yank them, because they get away with you.

"Q. Was he guiding the up side? A. Yes sir. * * * It happened so fast. Like I say, he just give one pull and everything was over."

Considered from a standpoint favorable to plaintiff we believe the evidence supports the submission of plaintiff's case. We think the physical facts; the testimony of plaintiff's lay witnesses concerning the manner in which the occurrence was brought about; the experts' testimony relating to the wearing and "braking" properties of the metal and the mechanical design and workings of the gears and of the other parts of the hoist and auto loader; and the experts' opinions also tending to show the worn and loose conditions of the hoist were reasonable, and that the jury was justified in adopting the evidence tending to support plaintiff's case and in refusing to follow the factual theory and opinions of experts supported and produced by defendants.

■ Thus far we have treated with defendant's contentions (1) and (2), but in treating with them we have also, in effect, decided adversely to defendant on its contention (5) of error in permitting plaintiff's counsel to ask hypothetical questions based on assumptions of fact contrary to plaintiff's own testimony. But defendant contends (3) that plaintiff was, as a matter of law, contributorily negligent in being beneath the loaded rack when it fell.

■ The jury reasonably could have found that plaintiff had just removed a leg from beneath the rack and had fixed it to the side thereof, and was backing away when Rome gave Lott the order to lower the rack and load. "I was almost out — — see, when the car go down, it go about six feet ahead forward." Plaintiff could have moved into . the space a foot or so wide between the rack and the side of the boxcar intending to stand there for the time, five or six minutes, normally taken in lowering the rack and load; or plaintiff could have moved along through this narrow space to safety at the center of the boxcar, but he said an oil "drip-sheet" and some other object, such as a jack, impeded his movement there. De Late's employees, including plaintiff, had been given orders "to watch it" and to "be careful." But they had not heard of an auto rack falling, although they always stood clear of the rack and the forward swing of the rack when it was lowered. Rome said "we never thought the thing could do that (suddenly fall) * * * I stayed there many times myself and watched them come down and just back away from them." We infer the occurrence here was a rare one. Inferentially, the rack fell because of the worn and loose conditions of the stated parts of the hoist. Plaintiff was entitled to assume precautions had been taken to protect him from the danger due to a defective hoist. To plaintiff, there was no obviously impending danger. We believe the issue of contributory negligence was for the jury. The instant case differs from cases cited by defendant—Coleman v. North Kansas City

Elec. Co., Mo.Sup., 298 S.W.2d 362, where plaintiff, an electrician, had voluntarily formed his own conclusion that he could work from an obviously dangerous position atop a transformer; Hamilton v. Laclede Elec. Co-op., Mo.Sup., 294 S.W.2d 11, where plaintiff, although she knew the uninsulated high-tension wires were there, "paid no attention"; and Chisenall v. Thompson, 363 Mo. 538, 252 S.W.2d 335, where plaintiff knew the safe way, but voluntarily chose a dangerous method of cleaning a cornpicker.

We hold the trial court did not err in overruling defendant's motion for a directed verdict.

■ (4) Plaintiff's verdict-directing Instruction No. 7 hypothesized and required the finding of facts in accordance with plaintiff's stated factual theory of the condition of the hoisting device, and that by reason of such condition the hoist was not reasonably safe; the instruction further submitted and required the finding that the condition could have been discovered by ordinary care in making a reasonably careful inspection; and that defendant when it inspected the boxcar failed to discover such condition and failed to use such care; and upon such findings, the instruction advised that defendant was negligent. The instruction further submitted and required the finding of the circumstances of the actual occurrence in accordance with plaintiff's factual theory, and continued by submitting "and that the failure, if any, of the Missouri Pacific to use ordinary care in inspecting the hoist mentioned in evidence * * * *either caused or contributed to cause* the rack to fall rapidly *and* injure Mr. Giambelluca, then you are instructed that Mr. Giambelluca is entitled to recover * * *." (Our italics.)

Specifically, defendant initially complains of the italicized language of the quoted clause as being erroneous, misleading and in direct conflict with defendants' verdict-directing Instruction No. 12 submitting contributory negligence—it is said instructions of this kind have been repeatedly condemned where the primary negligence of defendant and the contributory negligence of plaintiff only were in issue (citing Moon v. St. Louis Transit Co., 247 Mo. 227, 152 S.W. 303; Marsh v. Heerlein, Mo.Sup., 299 S.W.2d 441; Counts v. Thomas, Mo.App., 63 S.W.2d 416); and that the "contributed to cause" should have been immediately followed by a clause excluding the idea that plaintiff may recover even if he was negligent, that is, a clause, in effect, that plaintiff must have been in the exercise of due care, or the hypothesis of the negative of contributory negligence. We are further reminded that in the Marsh case (although a case in which the primary negligence of an only defendant and the contributory negligence of plaintiff were in issue) included the parenthetical advice, *299 S.W.2d* at page 445, as follows, "Nothing herein said should be construed to mean that the instruction would have been correct in the use of the clause 'or contributed to cause,' in this primary negligence case, even though there had been substantial evidence tending to show that the negligence of a third party concurred with defendant's negligence in causing plaintiff's injury, save and except if the instruction had limited the submitted contributing or concurring cause to the negligence of such third party." The Marsh case and the instant case are not Federal Employers' Liability Act (45 U.S.C.A. § 51 et seq.) cases as was Dunn v. Terminal R. Ass'n of St. Louis, Mo.Sup., 310 S.W.2d 825, wherein contributory negligence is not a bar to recovery, but operates only in diminution of damages; neither are they humanitarian negligence cases as was Liles v. Associated Transport, 359 Mo. 87, 220 S.W.2d 36, wherein contributory negligence is no defense; and in Evans v. Klusmeyer, 301 Mo. 352, 256 S.W. 1036, primary negligence in violation of ordinance was submitted as a direct contributing cause in instruction "4", but the instruction also required the

finding that plaintiff "was exercising ordinary care for her own safety."

In the instant case it has been noted that plaintiff's case was also submitted on primary negligence as against defendant Union Pacific. Plaintiff argues that the quoted parenthetical portion of the Marsh opinion was not a direct ruling, but was dictum or a reservation of the point for some subsequent ruling. However, assuming as dictum the parenthetical language of the Marsh opinion, we think it is sound in tending to prevent a jury's finding for plaintiff, although the jury may have believed that plaintiff was guilty of causal contributory negligence as submitted in a defendant's instruction. But with respect to Instruction No. 7 in the instant case, we cannot believe that the instruction was prejudicially erroneous in the use of "contributed to cause" or in failing to hypothesize or submit and require in some manner a finding of the negative of plaintiff's contributory negligence or in failing to limit the contributory or concurring cause to the negligence of Union Pacific. We note the language "contributed to cause" had as its object *the rack to fall rapidly* and injure Mr. Giambelluca." It is difficult to see how jurors of ordinary intelligence could suppose that negligence of Mr. Giambelluca could have caused or contributed to cause the rack to fall rapidly, although as noted the words "injure Mr. Giambelluca" are added conjunctively. By Instruction No. 12 plaintiff's contributory negligence in stepping from a place of safety to a place of danger under said rack or into its forward movement was submitted. Whatever his movement around, beneath or in front of the rack, plaintiff's movement could not have caused or contributed to cause the rack to fall rapidly.

It is also noted that the word "caused" and the words "contributed to cause" are not modified by the word "directly" or "proximately." As a rule it is safer that an instruction submitting the issue of primary negligence or contributory negligence to modify the submission of the essential element of causation by the use of the word "directly" (or "proximately"). Slates v. Joplin Butane Gas Co., Mo.Sup., 315 S. W.2d 808; Stumpf v. Panhandle Eastern Pipeline Co., 354 Mo. 208, 189 S.W.2d 223; see also Creech v. Blackwell, Mo., 318 S. W.2d 342. However, where, as here, the instruction requires the finding of negligent acts which, in the nature of things, necessarily directly or proximately caused the injury, then the instruction cannot be held erroneous because it does not require the jury to draw the inference which the law itself draws therefrom. Creech v. Blackwell, supra; Wilson v. Toliver, Mo.Sup., 305 S.W.2d 423; Knox v. Weathers, 363 Mo. 1167, 257 S.W.2d 912; Stumpf v. Panhandle Eastern Pipeline Co., supra.

We believe the instruction (No. 7) is not prejudicially erroneous in assuming or in failing to require the finding that the employee (Lott) "operated the hoist properly." The instruction hypothesized that one of the employees "gave a pull on the chain * * *" and that when he pulled down on the chain the sprocket wheel suddenly began to revolve rapidly "without further pulling on the chain." This was supported by plaintiff's evidence. We further believe the instruction was not misleading or erroneous in failing to submit that the worn hob gear caused the rapid descent of the rack. The instruction required the finding that the bronze gear of the hoist was worn "so that when the car rack was loaded and started downward by one pull of the chain the sprocket wheel would suddenly revolve," and that the chain was likely to jam causing a sudden shearing force to be applied to the bolts. The instruction further required the finding that, the chain having been pulled, the sprocket suddenly revolved jamming the chain and causing the bolts to shear, "and that the bolts would not have sheared had they not been loose." Considering the instruction as a whole, and being mindful of the protracted evidence as to the causes of the rapid descent of the rack, we think

that the jury could not have but understood the issues, and we believe the instruction by necessary implication conveyed to the jury the requirement that they were required to find that the worn hob gear and the loose cap screws when the chain was pulled were the physical causes of the rapid descent of the rack.

 (6) In his opening statement to the jury counsel for plaintiff stated, "We have never seen – – we would like to – – but we have never been able to get it – – the device * * *." Defendant's counsel objected on the ground that the statement was contrary to plaintiff's rights under the law—it was said plaintiff could have taken depositions in Texas, and could "subpoena a witness." Plaintiff's counsel withdrew the statement, and the court directed the jury to disregard it. Plaintiff's counsel announced that he would later request a subpoena duces tecum to issue on the Texas & Pacific. No objection was made by defendants to this announcement. Subsequently, plaintiff's counsel procured subpoenas and sought to serve them on the Texas & Pacific and also on defendants. The following day plaintiff's counsel, without the presence and hearing of the jury, stated that the subpoenas had been served on defendants and the general agent of the Texas & Pacific and that the device had not been produced. He was asking permission of the trial court to state these circumstances to the jury. Defendants' counsel objected on the ground that the hoist was the property of Texas & Pacific; neither of defendants could produce it; that it was ridiculous to have served the general agent of the Texas & Pacific; that the subpoenas addressed to a corporation were invalid; and that the statement if made to the jury would be prejudicial and misleading. The trial judge said the court would make a statement to the jury that plaintiff's counsel did cause the issuance of a subpoena duces tecum, "but for legal reasons it could not be served." Counsel for defendant Union Pacific objected on the ground that plain-

tiff had "no right to have it explained—it's adding more to what is a straw in the first place." Counsel for defendant joined in the objection. The judge said, "I'll overrule the objection and make a statement." Then, within the presence and hearing of the jury, plaintiff's counsel stated that the court at his request had issued subpoenas to defendants and Texas & Pacific to produce the device and that he wanted to report to the court that the device had not been produced. Defendant objected on the ground that the statement was "entirely contrary to the record just made in chambers." Counsel for Union Pacific requested a mistrial. Plaintiff's counsel asked the judge if it was not the understanding that "you (the judge) would make a statement and so would I?" The trial court declared a temporary recess, and requested counsel to come in chambers. The transcript does not show what transpired in chambers. After the recess, the judge said to the jury, "The Court will tell the jury – – for legal reasons the subpoenas could not be served." At the bench, out of the hearing of the jury, the motion for a mistrial was overruled.

Defendant contends the statements and related conduct on the part of plaintiff's counsel were in bad faith, and clearly for the purpose of prejudicing the jury. It is said two vital facts were without doubt known to plaintiff's counsel, one, that Texas & Pacific could not be served with a subpoena in Missouri, and two, plaintiff's counsel knew defendants could not honor subpoenas to produce the hoist which was known to be the property of Texas & Pacific. The principle recognized in Belding v. St. Louis Public Service Co., 358 Mo. 491, 215 S.W.2d 506, is relied on, that is, that no inference may be drawn and no unfavorable comment made by counsel on account of the nonproduction of witnesses whose evidence is equally available. However, we have the view the principle stated in the Belding case, wherein the trial court sanctioned the challenged argument, does not govern in the situation here, regardless.

of whether the hoist was or was not equally available to the adversary parties. Texas & Pacific had been a party, and we have noted that before the conclusion of plaintiff's case counsel for defendant Union Pacific brought a burlap bag purporting to contain the parts of the hoist involved in this case to the courtroom and, in the presence of the jury, announced that in the interim after the statement that plaintiff's counsel had caused the issuance of the subpoenas, the device had been procured, and the further announcement was made that the device was available for such use as plaintiff wants to make of it, "and we offer it in response to the subpoena, even though it was an invalid one."

Counsel for plaintiff had withdrawn the remarks made in his opening statement relating to his inability to inspect the device, and the jury had been instructed to disregard counsel's remarks. Counsel for plaintiff announced he would procure subpoenas duces tecum. There was no objection to this announcement. Valid or invalid, the subpoenas duces tecum at that time apparently were ineffectual, and the trial court in its rulings was in fairness explaining away any inference unfavorable to either of the adversary parties, plaintiff and defendants, by saying the subpoenas, for legal reasons, could not be served. Admittedly, the situation was an awkward one and in part was brought about by the fact that multiple defendants were originally joined in this action and by the suggestions or arguments by defendants' counsel in their objections as noted supra. Without extending this opinion to include a painstaking analysis of them, we say that with respect to other incidents pertaining to the production of the hoist which occurred in the examination of a witness and in argument, of which incidents defendant herein complains, the trial court ruled in favor of defendants upon their objections. We think that here much should be left to the discretion of the trial court, the presiding officer thereof being present and observing the effect of plaintiff's statements, defendants' objections, and the overall effect of the several trial incidents. Also, we see that the trial court must have again considered the effect of these incidents in ruling on defendant's motion for a new trial. We hold the trial court did not err or abuse its discretion in refusing to order a mistrial.

▮ (7) Plaintiff was fifty-one years old at the time of trial. Before he was injured he had worked for De Late at Stafford cleaning, greasing and undercoating cars. He received $50 per week straight pay, sometimes $60 or $65. Plaintiff is uneducated, cannot read or write, can sign his name, that's about all.

When the rack and automobile, together weighing more than 5,000 pounds, fell upon him, plaintiff was crushed and pinned to the floor from the waist down and was in extreme pain for forty-five minutes before jacks could be procured to lift the rack and load. During this time a physician administered coramine but no narcotic. Plaintiff was then hospitalized for over three months; confined to his bed at home for two months; was in a wheel chair about a year; used a brace on his right leg for a year; and then was given a cane. He was unable to work for nearly five years. He now has a job, doing light janitor work at a school, at a salary of $260 per month.

Upon admission to the hospital, plaintiff was in shock and was given transfusions of blood. The diagnoses were brain concussion, moderately severe; compound comminuted fracture of the left elbow; fracture of the right tibia and fibula just above the ankle; fracture and dislocation of the left pelvis; laceration of the penis and scrotum, with evisceration of the left testicle; multiple contusions and abrasions of the head, body and limbs; and internal injuries, full extent undetermined. An open operation was performed upon the right leg below the knee and a closed operation upon the left elbow, and these fractures reduced. Plaintiff was given post-operative treatment with the left leg in traction. After treatment and convalescence, his injuries have

left plaintiff with scars about the face; thickening of the arm above the elbow, and weakness of the grip of the left hand; limitation of motion in the spine and tenderness in the sacroiliac and the lumbo-sacral joints; some atrophy of the right thigh and limitation of motion of the left hip, ankle and elbow; loss or atrophy of the left testicle; and traumatic arthritis of the sacroiliac joint. Dizziness is attributable to the concussion. His injuries have affected his ability to control his "stool," and there is some lessening of sexual powers. He does and will experience pain in physical activities. Pain in the back and pelvis—"that's always on me." He has a permanent disability which a physician at one time estimated as fifty per cent. The doctor thought plaintiff is not able to do manual labor. Medical expenses were $2,924.37.

The evidence supports the conclusion that plaintiff suffered severe, painful and permanent injuries, and there are elements of special damages in loss of wages something like $12,000, and nearly $3,000 in medical expenses. Plaintiff, practically without formal education, is not equipped to engage in employment other than physical labor, and in the activities of such work he does and will experience pain, although he has demonstrated he can do light work and at a wage of a little more than he received before his injury.

We have examined the cases cited in the briefs of the parties plaintiff and defendant, and have found them helpful in examining the issue of excessiveness of the award, but none of the cases cited are in all respects comparable on the facts with our case. However, in Amos v. Southern Ry. Co., Mo. Sup., 273 S.W.2d 155, decided in 1954, plaintiff, a car inspector, 49 years old, earning $350 per month, suffered injuries, although not all the same as plaintiff herein, fairly comparable in severity but perhaps less in disabling effect. Plaintiff Amos (as did plaintiff Giambelluca) returned to gainful employment. Plaintiff Amos went back to work in October, 1949, after his injury in April of that year. Plaintiff Amos and

plaintiff Giambelluca were not totally disabled. The Amos award of $108,000 was reduced to $38,000. We think the amount of the award in the instant case is excessive, but, in admeasuring a remittitur to be conditionally required, we here say we know of the almost constant depreciation in the purchasing power of money during the last few years and considering this factor with others to be taken into account on the issue of excessiveness of an award, we are of the opinion the award is excessive in the amount of $25,000.

■ (8) This action was instituted January 22, 1954. On March 19, 1954, General Accident, Fire & Life Assurance Corporation, employer De Late's workmen's compensation insurer, by leave, intervened and sought to assert its right of subrogation. September 15, 1954, the trial court sustained defendants' motion to dismiss plaintiff's petition and the petition of intervenor-insurer on the ground that plaintiff's claim was barred by limitation under Texas statute. Upon appeal to this court, the judgment and order of dismissal was reversed and the cause remanded. Giambelluca v. Thompson, General Acc. Fire & Life Assur. Corp., Intervenor, Mo.Sup., 283 S.W.2d 531. It is to be inferred that, after remand, intervenor-insurer dismissed its intervening petition, and consented to the prosecution of the action by plaintiff in his own name.

March 27, 1954, the insurer had instituted an action in its own name in the District Court of the United States, Western District of Missouri, asserting its claim for subrogation against the original defendants herein and General Motors, for the amounts it had paid in weekly payments, in compromise, and in medical expenses—a total of $9,399.37. In insurer's action in the District Court insurer did not seek to control the whole claim, that is, insurer did not state a claim for the recovery of the whole of damages for the injuries suffered by plaintiff. July 12, 1954, the District Court sustained the motion to dismiss filed by (trustee Thompson) Missouri Pacific, and others,

and entered judgment of dismissal of insurer's petition on the ground that the action was barred by limitation. Plaintiff-insurer did not appeal.

Defendant in the trial of the instant case upon remand proffered the District Court's judgment of dismissal, and the exhibit was excluded. This ruling, defendant contends, was error; and defendant argues that the trial court erred in refusing to rule that the District Court's judgment barred plaintiff, under the doctrine of *res judicata,* from recovery in this case of any sums to which the insurer was subrogated, or in refusing to rule that plaintiff could recover only such damages as were in excess of the amount ($9,399.37) paid to him as compensation and medical expenses. And, apart from the contention of *res judicata,* plaintiff contends there was error in giving an instruction (No. 19) advising that the fact plaintiff had been paid compensation by insurer was not to be considered in barring his recovery "or as diminishing the amount of his damages, if any." This, says defendant, is contrary to Texas law because it permitted plaintiff to recover the sums to which insurer was subrogated, and in this case in which the insurer is not now a party. These several contentions are ruled adversely to defendant.

 The claim or cause of action which had accrued was in plaintiff-employee. But the insurer had an interest in the claim, that is to say the insurer had an interest measured by the extent of its right of subrogation which right was derivative depending upon a recovery by the employee of damages growing out of the personal injuries sustained as a result of the act or omission of a third party, defendant. Under Texas law, such a claim is single and joint. It is not severable. Fort Worth Lloyds v. Haygood, 151 Tex. 149, 246 S.W.2d 865; Yeary v. Hinojosa, Tex.Civ. App., 307 S.W.2d 325; Hartford v. Accident & Indem. Co. v. Weeks Drug Store, Tex.Civ.App., 161 S.W.2d 153; Giambelluca v. Thompson, General Acc. Fire &

Life Assur. Corp., Intervenor, supra; Vernon's Ann.Civ.St.Tex. art. 8307, § 6a.

The District Court's judgment of dismissal was of a petition attempting to state a claim for contribution only on the theory of a recovery of part of the single claim of Giambelluca and in an action in which Giambelluca was not actually a party, nor was the action to the joint use and benefit of Giambelluca and the insurer. The issue of negligence vel non of the third parties, alleged tort-feasors, the basis of the single, joint and inseverable claim, was attempted to be litigated and the single, joint and inseverable claim split or severed and the insurer's right of subrogation thereby attempted to be established in an action to which Giambelluca was not a party and in which the rights of all interested parties, inter se, could not be adjudicated. Limitation of actions was the ground on which the District Court dismissed the insurer's action. Upon former appeal, Giambelluca v. Thompson, General Acc. Fire & Life Assur. Corp., Intervenor, supra, this court held the plaintiff's claim, including intervenor-insurer's right to subrogation, was not barred by limitation. The trial court—the Circuit Court of the City of St. Louis—which court had originally entertained jurisdiction of the action on the whole of the single, joint and inseverable claim, had all of the interested parties before it and was in a position and had the power to determine the whole controversy and finally adjudicate all of the rights of the parties. We consider the former decision of this court as governing here with respect to any issue of limitation of actions, and we think the whole of the single, joint and inseverable claim was entirely unaffected by the District Court's judgment.

In Hanson v. Ponder, Tex.Com.App., 300 S.W. 35, cited by defendant, the action for personal injuries was instituted by employee Hanson and the workmen's compensation insurer intervened claiming its right to subrogation. Judgment was rendered for defendants. The intervenor-insurer did not appeal, but accepted the judgment against it.

Plaintiff brought error, and the reviewing court reversed (in part) and remanded. The amount of "compensation" which had been paid by insurer was ordered to be deducted from such damages as might be awarded plaintiff Hanson by a jury upon a retrial. Whatever was the interest of the intervenor-insurer in the claim, such interest had been finally adjudicated. In that case the whole of the single and joint claim was the subject of the action; all parties interested in the claim were parties to the action; and the interests of all parties could and were or were to be finally adjudicated.

■■■■ As noted supra, it is urged that, under Texas law, if the insurer is not a party to the action, an employee can recover from the third party tort-feasor only the excess of damages over the compensation and medical expense paid. The cases cited are those of Texas. This action was brought in Missouri, and we think the procedure which may be utilized in litigating the stated claim including the insurer's interest is a matter for Missouri procedure. As noticed in Kelley v. Summers, 10 Cir., 210 F.2d 665, cited by defendant, the right of subrogation is substantive, but the manner of asserting it is procedural. In Missouri, a plaintiff-employee may recover for the subrogated insurer without joining the insurer as a party to the action. Smith v. Siedhoff, Mo. Sup., 209 S.W.2d 233, and cases therein cited. In the event of recovery by the employee against the third party tort-feasor, the insurer is entitled to receive out of the damages collected an amount equal to the compensation paid by the insurer to the employee. Reiling v. Russell, 345 Mo. 517, 134 S.W.2d 33. In this connection, we note that the instruction (No. 19) of which defendant complains additionally told the jury that, under the law, if plaintiff "recovers any damages in this case he must first repay out of any such recovery all sums to said insurance company which it has paid to him by way of workmen's compensation benefits or has paid for his medical care."

If plaintiff within fifteen days enters a remittitur of $25,000, the verdict and judg-ment should stand in the amount of $50,000 as of the date of original rendition; otherwise, the judgment should be reversed and the cause remanded. It is so ordered.

COIL and HOLMAN, CC., concur.

PER CURIAM.

The foregoing opinion by VAN OSDOL, C., is adopted as the opinion of the court.

All of the Judges concur.

On Motion for Rehearing or, in the Alternative, to Transfer to Court en Banc.

PER CURIAM.

As may be noted in reading the opinion, we refuse to hold as a judicial admission plaintiff's own testimony that the legs designed to support the rack were loose and that nobody used the hoist to raise the rack and load, the testimony carrying the inference that the rack and load had been supported by the cables of the hoist from Kansas City to Sugarland. This ruling, says movant-appellant, is erroneous and in conflict with the well-established rule restated in Smith v. Siercks, Mo.Sup., 277 S.W.2d 521, at page 525, as follows, " 'But a party's testimony on the stand as a witness may be of such a nature as to have the effect of a judicial admission which not only relieves the opponent from adducing evidence, but precludes the party himself from disputing it, either by his own testimony or by other witnesses. Wigmore, Evidence, Sec. 2495a (3d Ed.). Thus, if a party in full possession of his mental faculties testifies unequivocally and understandingly to a material fact peculiarly within his own personal knowledge, which negatives his right of action or defense, he is precluded from relying upon any testimony to the contrary, unless he gives some reasonable explanation of his previous statement as having been the result of mistake, oversight, lapse of memory or misunderstanding. In the absence of such an ex-

planation, the party may not have the benefit of any testimony which is contrary to his own testimony, whether given by himself, Steele v. Kansas City Southern R. Co., 265 Mo. 97, 175 S.W. 177, by his adversary's witnesses, Elkin v. St. Louis Public Service Co., 335 Mo. 951, 958, 74 S.W.2d 600, or by his own witnesses. Mollman v. St. Louis Public Service Co., Mo.App., 192 S.W.2d 618, 621, and cases cited. Where, however, the testimony of a party is not a positive statement of fact within his own knowledge, but is a mere estimate or opinion, it does not have the effect of a judicial admission. * * *.' " We have not intended to change the rule as restated in the Smith case, neither did we here ingraft an exception upon it, we think. The re-examination of our ruling on this contention as it is presented in the instant record bulwarks the view that the opinion in this respect is correct. In the instant case it was and is our opinion that, considering all of the relevant evidence, plaintiff's testimony that the legs were loose and that no one had loosened them was a statement and a conclusion which (a jury reasonably could have found) were contrary to the actual facts established by more knowledge-able testimony as well as the operation of physical laws; and a statement and conclusion which did not, under all of the circumstances, amount to a positive statement of fact within the plaintiff's own knowledge, and thus was only an opinion lacking the effect of a judicial admission.

 Also we have reconsidered our opinion in its treatment with the contention (8) of *res judicata*. As we have said the insurer instituted an action in its own name in the District Court of the United States asserting a claim measured by its right of subrogation, and did not appeal from the District Court's judgment of dismissal, which judgment was based on the ground that the action was barred by limitation—a judgment conflicting with the judgment of this court in Giambelluca v. Thompson, General Acc. Fire and Life Assur. Corp., Intervenor, Mo.Sup., supra, 283 S.W.

2d 531. Movant-appellant has pointed out that it did not object to the splitting of the single, joint inseverable claim thus asserted in the District Court by the insurer, and states in its instant motion that plaintiff's individual interest in the claim is "not affected one iota" by the District Court's judgment adverse to the insurer. This has been the question which has been troublesome to us, and we have in the principal opinion declined to order a reduction measured by the amount of the award to which the insurer would have been entitled by subrogation. This, because we doubted that plaintiff is protected in the instant case by the District Court's judgment in that action to which plaintiff was not a party. We have a regard for the principle that in Missouri whoever (the employer or the employee [as here]) recovers on the claim against a third person tort-feasor holds so much of the recovery as in truth and fact belongs to the other as an express *trustee*—the employee to see that the employer's right of subrogation is protected, and the employer to see that the employee receives any surplus after his indemnification. General Box Co. v. Missouri Utilities Co., 331 Mo. 845, 55 S.W.2d 442; Reiling v. Russell, supra, 345 Mo. 517, 134 S.W.2d 33; Schumaker v. Leslie, 360 Mo. 1238, 232 S.W.2d 913. We have concluded, however, that, in this case, inasmuch as the insurer, having been a party-intervenor in this case but subsequent to the remand of this cause upon former appeal dismissed its intervening petition and consented to the prosecution of the action on the whole claim by plaintiff in his own name, plaintiff is protected and the insurer bound by our recognition of the District Court's judgment adverse to the insurer on its right of subrogation. Plaintiff, in the trial court and herein upon appeal, has the insurer's consent and in good faith endeavored to protect and recover on the whole claim including the recovery measured by the insurer's right of subrogation. In this situation we hold that plaintiff is not now subject to account as a trustee to insurer for any sum remaining after a reduction of the award to the extent

of $9,399.37, which is now ordered and our principal opinion is accordingly modified, which amount is equal to that paid by insurer as compensation and medical expenses. This reduction is additional to the conditional remittitur of $25,000, to which remittitur plaintiff has heretofore on January 21, 1959, consented.

Therefore, the judgment in favor of plaintiff and against defendant should stand in the amount of $40,600.63 as of the date of original rendition, April 12, 1957, and it is so ordered. The motion for a rehearing or, in the alternative, to transfer to the Court en Banc is overruled.