MACK WALDRON, Respondent, v. SKELLY OIL COMPANY, Appellant, No. 32017—257 S. W. (2d) 615.

Division Two, April 13, 1953.

Motion for Rehearing or to Transfer to Banc Overruled, May 11, 1953.

*Norris H. Allen, Anderson, Gilbert, Wolfort, Allen & Bierman, Eugene E. Northern* and *Breuer & Northern* for appellant.

1148

*Llyn Bradford, Neale, Newman, Bradshaw, Freeman & Neale* and *Jean Paul Bradshaw* for respondent.

WESTHUES, C.—Plaintiff Mack Waldron was on October 2, 1950, seriously injured by burns which he suffered when gas ignited as Waldron was attempting to light a gas hot water heater located in a basement at 688 Salem Avenue, Rolla, Missouri. He filed this suit against the Skelly Oil Company claiming that negligence of the Oil Company caused his injuries. A trial resulted in a verdict for plaintiff in the sum of $25,000. An appeal was allowed to this court.

Plaintiff insists that only the record proper is before this court for review. It is claimed that the motion for new trial filed on May 11, 1951, was a nullity because at that time the case had, at the request of appellant Oil Company, been removed to the Federal Court.

A brief recitation of the events occurring in the proceedings will be necessary. When the case was called for trial, the defendants were appellant Skelly Oil Company, Rolla Uregas Corporation, and Uregas Service, Inc. After the jury was sworn to try the case, plaintiff voluntarily dismissed as to the two Uregas corporations, leaving Skelly [616] Oil Company as the only defendant. Plaintiff's counsel then made a statement of the case to the jury. At this point, defendant asked the court for time to file a petition for removal of the case to the Federal Court on the ground that Skelly Oil Company was a foreign corporation. This request was denied. The case was tried and on May 3, 1951, the jury returned a verdict for plaintiff. On May 4, 1951, the defendant filed a petition for removal in the Federal Court and the petition was granted. On May 11, the defendant filed its motion for new trial in the circuit court. The Federal Court, on November 26, 1951, sustained plaintiff's motion to remand. The case was remanded to the state court. On December 21, 1951, the trial court was asked to pass on the motion for new trial. The court refused to rule on the motion on "the ground that the Court feels that it has no jurisdiction whatsoever." On December 31, 1951, the defendant Oil Company applied to this court for an order to the trial court to file a notice of appeal (Section 512.160, RSMo, 1949, VAMS). This court en banc on January 16, 1952, sustained the motion and on January 18, the defendant filed its notice of appeal in the circuit court. Defendant also filed an appeal bond in the sum of $40,000. We rule that the motion for new trial was timely filed and that the case is here for

review on the merits. The fact that the motion was filed after the case was removed to the Federal Court did not invalidate its filing.

Plaintiff offered, and the court gave, an instruction submitting only one charge of negligence: that a regulator located at the tank on the outside of the building was defective. This equipment was the property of the defendant Skelly Oil Company. The hot water heater and the equipment located in the basement were the property of Mrs. Lizzie Craine.

Defendant's principal point briefed seeking a reversal of the judgment is that the evidence was insufficient to sustain a verdict for plaintiff on the issue of negligence submitted in plaintiff's instruction. This will require a full statement of the evidence and a close analysis thereof.

The evidence supports the following statement of facts: Mrs. Lizzie Craine owned property at 688 Salem Avenue, Rolla, Missouri. In the main building there were three apartments. To the rear of this building was a small building which had been converted into a two-room apartment. Mrs. Craine furnished hot water for the occupants of the four apartments. For this purpose she had a Servel hot water heater installed. About September 1, 1950, the Rhodes Hardware Company contracted with Mrs. Craine to sell her Skelgas (propane gas) for this heater. Rhodes Hardware Company was representing the defendant Skelly Oil Company and sold Skelgas in the Rolla territory. A bottle or tank of Skelgas was delivered to the building about September 10, and attached to the gas pipe serving the heater in the basement. In the latter part of September the tenants informed Mrs. Craine that they had no hot water. Mrs. Craine called the Hardware Company and ordered another bottle of Skelgas. Plaintiff and another employee, Clarence Gaddy, on Saturday, September 30, at about 2:00 p.m., delivered the bottle of gas. They removed the empty bottle, attached the full one, and turned on the gas. Plaintiff testified that no one was at home at the apartment so they did not go to the basement or enter the building to check on any of the gas equipment. The tenants testified that on Saturday evening, Sunday, and Monday they smelled gas in the building and Mrs. Craine was notified. On Monday Mrs. Craine in turn notified the Rhodes Hardware Company of this fact. Edgar McWhorter, a clerk in the store, accompanied by George Moshier, went to the Salem Avenue address to check on the trouble. He testified that when he entered the basement he detected a strong odor of gas and for that reason did not attempt to light the heater; that he opened a window, turned off the gas at the heater, and also at the tank outside. This occurred about 1:30 or 2:00 p.m. Later that same day, McWhorter asked plaintiff and his helper Gaddy to go to the Salem Avenue address to light the heater. Plaintiff and Gaddy arrived there about 3:00 or 3:15 [617] p.m., turned on the gas at the tank outside; they then knocked on the door at the apartment and

were admitted to the basement through the kitchen of one of the apartments. Mrs. Hilda Foran who admitted plaintiff and Gaddy to the building testified as follows:

"Q. Did they enter the basement through your apartment?

"A. Yes, they did.

"Q. Did you have a conversation with them as they were entering the basement?

"A. Yes, I did. I turned the light on for them and I said 'That basement is full of gas', I said, 'You can still smell it'.

"Q. Did they make any reply or response to that?

"A. No, they didn't; they were very silent men and they just went down in the basement."

This witness stated that a few minutes after, the two men went to the basement she heard an explosion; that she saw fire all over the kitchen and also in the next room; that many places were seared; that her hands were badly burned. She described the fire in the following manner:

"Q. Was the door from your kitchen down into the basement open during all the time that these individuals were in the basement?

"A. No, it was closed.

"Q. And did it continue closed until the explosion occurred and they came up the stairway and out through the kitchen?

"A. No, it was closed until the explosion and the fire blew the door open.

"Q. Did the fire come up into the kitchen?

"A. Yes, it did.

"Q. Will you describe the fire,—was it just a blaze, a flash blaze or what was it?

"A. Well, yes, it was—it was a blaze and it sort of danced around, it danced around and hit me and then it went the opposite direction to the living room, but I suppose that was because my back kitchen door was closed and the living room door was open and it followed the direction of the draft, no doubt.

"Q. Did it cause a flame to catch fire to any furnishings in the apartment where you were?

"A. Yes, it did. It burned the curtain in the living room, and it burned the wall paper and the ceiling over the door leading to the living room."

Plaintiff testified that after he entered the basement he bent down close to the heater and struck four matches but none of them would burn; that he then turned to Gaddy and asked for a cigarette lighter; that he "flipped the wheel" on the lighter and immediately there was fire and an explosion. Plaintiff stated that he did not turn on the gas in the basement. Plaintiff and Gaddy though badly burned managed to get out of the basement and were taken to doctors for treatment.

Both were taken to a hospital where Gaddy died as a result of these burns and plaintiff remained in the hospital many weeks. His injuries are permanent and serious.

The sufficiency of the evidence to sustain plaintiff's verdict depends upon the answer to the following question: Did the evidence support a finding that the regulator on the outside of the building was defective and did such defect, if any, permit the gas to enter the basement? The evidence disclosed that the pressure in a bottle of Skelgas ranges from about 60 to about 160 lbs., per square inch, depending upon the temperature. The gas when turned on and used passes through a regulator before it enters a pipe going to the basement. This regulator is supposed to reduce the pressure to about 6 ounces per square inch. In the basement the gas passes through a safety device called a "Unitrol" which is supposed to close a valve when the pilot light is out and thereby preclude the emission of gas through the pilot. A "thermostat control cut-off" closes when the water in the tank reaches the temperature indicated on the gadget controlling the temperature of the water. If the gas present when the explosion occurred passed into the basement because of a defect in the Unitrol and not because of a defect in the regulator, defendant would not be liable.

Robert Falkenrath, employed by the Rhodes Hardware Company as a "trouble shooter" in the gas business, was called as a witness by the plaintiff. He testified that he went to the Salem Avenue address on the morning after the explosion, turned on the gas at the tank, then went to the basement, lighted the heater and it burned normally. He stated that he returned to the above address on Wednesday or Thursday and again turned on the gas at the tank; that a man who claimed to be a state inspector was with him; that the inspector went to the basement while he, Falkenrath, turned on the gas at the tank outside; that when the witness went to the basement, he heard a hissing noise; that gas was passing through the control system while the pilot light was out; that he could smell the gas. He testified as follows:

"Q. You heard the gas coming out?
"A. Yes, sir.
"Q. And you could smell it?
"A. Yes, sir.
"Q. Did you attempt to light the heater at that time?
"A. No, sir.
"Q. Could you tell where the gas was coming from?
"A. Yes, sir.
"Q. Where was the gas coming from?
"A. Coming out of the burner.
"Q. Coming out of the burner?
"A. Out of the burner on the heater.

"Q. What did that indicate to you, if anything?

"A. Only one thing that it indicated to me, was a faulty 100% control.

"Q. Now where is this 100% control that you speak of located?

"A. It is built into the—it is built into the control of your Servel heater."

The "100% control" is the gadget marked "Unitrol." This witness stated that the proper gas pressure for the heater in question was 5 ounces per square inch. The evidence of various witnesses was that the controls located in the basement when working properly control the gas coming through as follows: Enough gas is permitted to pass through at all times to keep the pilot light burning; the pilot light is not supposed to go out except when the gas is cut off completely. A thermostat control calls for gas and opens a valve permitting gas to come through whenever the temperature of the water falls below the point as indicated by the temperature control gadget. When the water reaches the temperature desired, this gadget shuts off the flow of gas. Whenever the pilot light is out for any reason, the gas coming through will not light and therefore will escape through the burner if the Unitrol is not functioning. However, the Unitrol when operating properly cuts off all flow of gas any time the pilot light is not burning. It is this control that the witness Falkenrath, stated was not functioning properly and permitted gas to pass into the burner and thence into the basement. Plaintiff testified that he replaced the empty gas bottle with a full bottle on Saturday about 2:00 p.m., and turned on the gas at the tank on the outside of the building. The natural conclusion is that at that time the pilot light was out because the old bottle of gas was empty. When the gas was turned on by plaintiff, the Unitrol should have prevented any gas going to the burner until the pilot was lighted.

Plaintiff's principal witness upon whose evidence he relies to support his theory that a defect in the regulator at the tank on the outside of the building caused the gas to escape was Dr. Walter A. Quebedeaux. This witness who had a Ph.D. degree in organic chemistry agreed with witness Falkenrath that the Unitrol was out of order. Edgar McWhorter, a witness for the defendant, testified that on Monday sometime after noon he turned off the gas at the tank and also at the heater. In this he was corroborated by plaintiff's witness George Moshier who was with him (McWhorter) on Monday at the Salem Avenue address. Moshier thought they left there about 2:00 p.m. If, therefore, the Unitrol was not functioning, gas was passing through the burner from the time plaintiff turned on the gas on Saturday afternoon until McWhorter turned off the gas on Monday afternoon which was in excess of forty hours. Tenants smelling gas from Saturday to Monday supports this conclusion and tends [619] to prove that

all the escaping gas did not remain in the basement but permeated other parts of the building.

The regulator and the bottle on the outside of the building were removed and kept at a garage operated by a Lee R. Courson. Dr. Quebedeaux obtained permission to examine the regulator and bottle. The witness' testimony was that his examination disclosed the following: The bottle was about one-half full of propane gas. When full it contained 100 lbs. of gas. The witness stated that he found an egg sac of the rose wasp on the diaphragm of the regulator; that the rose wasp builds its nest at the close of the rose season; that the wasp could not have made its nest inside the regulator when it was connected for service. He stated that the diaphragm was old and unreliable; that in the condition in which he found it, it could operate properly one time and then another time it would fail; that the seat inside the regulator was stuck to the jet and in such condition no gas could pass through the regulator; that he found a sticky glue-like substance inside the regulator. His conclusion was that the regulator was not functioning properly and permitted more than 12 lbs. of pressure to enter the pipe going to the basement; that the controls in the basement when closed would not withstand more than 12 lbs. of pressure and, therefore, gas was forced through the controls and into the basement. It was the theory of this witness adopted by plaintiff that on Monday afternoon, McWhorter shut off the gas at the tank and also in the basement, opened a window; that before plaintiff and Gaddy arrived an hour or two later, all of the gas had passed out of the basement; that when plaintiff turned on the gas at the tank, the gas under pressure in excess of 12 lbs., per square inch, was passed through the controls in the basement in sufficient quantities by the time plaintiff reached the basement about 5 to 10 minutes later to cause the explosion which injured plaintiff. A careful analysis of the evidence has convinced us that such a theory is based on speculation in its entirety and is inconsistent with the facts as proven and admitted by plaintiff. Dr. Quebedeaux and plaintiff admit that the Unitrol located at the heater in the basement was not functioning; that with the pilot light out, the gas was not cut off by this control. Dr. Quebedeaux testified that if the Unitrol was not functioning and the pilot light was out, gas would continue to flow into the burner because the thermostat called for more heat; that gas would pass through such burner at its normal operation at about 1 lb. per hour. He testified that the tank was about one-half full; that about forty-seven pounds or so had been used. From Saturday when plaintiff turned on the gas at the tank outside until Monday when McWhorter turned it off was about forty-six or forty-seven hours. Quebedeaux testified that had the gas escaped during all of that time under the pressure of more than 12 lbs., the tank would have been empty long before Monday. The evidence is that the regulator had been function-

ing properly all through September. It was operating properly when tested after the explosion. Dr. Quebedeaux was asked about a safety gadget on the regulator and he stated that it was an air vent. The evidence showed that this gadget is a safety device referred to in the evidence as a "pop-off valve"; that in case the regulator permitted more pressure on the line than was necessary, this safety discharge valve would open and the gas vapor would be discharged into the atmosphere outside the building. A pressure of less than 2 lbs. forces open this valve. Not a witness for the plaintiff or for the defendant testified that this safety discharge valve on the regulator was not functioning properly. The evidence was that the propane gas is heavier than air. From Saturday to Monday noon about forty-five lbs. or more of gas escaped into this basement of 12′ x 12′. Tenants smelled gas in their apartments during all of this time. It seems to us to be preposterous to say that all of the gas (heavier than air) which passed through the burner from Saturday to Monday passed out of the basement in an hour or so through a small window about 4 or 5 feet above the floor, and that the gas coming through in a few minutes on Monday would [620] remain there in sufficient quantity to cause an explosion. That the curtains in the living room upstairs were burned and Mrs. Foran's hands seriously burned while she was in the kitchen, indicate gas was present before plaintiff reached the building on Monday. The only logical conclusion is that, as Falkenrath, plaintiff's witness, expressed it, "a faulty 100% control" caused the gas to be in the basement.

We would be compelled to disregard admitted facts, employ a number of "ifs," and do a great deal of speculating to draw the conclusion that the regulator caused the gas to be in the basement. To conclude that a faculty Unitrol was the cause, we need not disregard any admitted facts, do no speculating, but simply admit the obvious as shown by plaintiff's evidence.

We shall point out a few facts to show the non-probative value of Dr. Quebedeaux's evidence. He testified a rose wasp could not enter the regulator when it was in use. The regulator functioned all during September and after the explosion. The rose wasp must have built its nest after the regulator was detached and placed in storage at a garage. Hence, the rose wasp egg sac and the sticky substance could not have caused any defect in the regulator before October 2. This witness stated that the regulator permitted too much gas to pass through the line in September when the first bottle was being used. He admitted he did not know how many people were using hot water or the extent to which the heater was required to furnish hot water. Dr. Quebedeaux was beyond question mistaken when he said that the regulator when functioning properly reduced the pressure of the gas no further than 4 to 5 lbs. All the other evidence, including that of plaintiff's witness Falkenrath, was that the proper pressure is about

5 ounces, not 5 pounds. The safety discharge valve on the regulator could not withstand a pressure of two pounds. Dr. Quebedeaux did not know the purpose of this safety valve. No one testified it was not functioning properly. There was evidence that it was operating.

We have an odd situation in this case. Plaintiff's evidence when considered in its entirety points unmistakably to a faulty Unitrol as being the cause of the injury for which he asks damages. The defendant Skelly Oil Company is admittedly not liable on that theory. To arrive at the conclusion that a faulty regulator for which defendant would be liable was the cause, we must speculate and draw inferences inconsistent with the facts proven by plaintiff and make surmises that are not reasonable. In such a situation a plaintiff may not recover. Ducoulombier v. Thompson, 343 Mo. 991, 124 S. W. (2d) 1105, l.c. 1110 (5-7); Raftery v. Kansas City Gas Co., 237 Mo. App. 427, 169 S. W. (2d) 105, l.c. 109, 110 (5-7). In Cole v. Uhlmann Grain Co., 340 Mo. 277, 100 S. W. (2d) 311, l.c. 317 (1-7), is stated a rule applicable here: ''* * * where the evidence shows that the occurrence which caused plaintiff's injury may have resulted from two or more causes, in order to hold defendant liable, plaintiff must have substantial evidence tending to show that the cause for which defendant would be liable was the actual cause thereof.'' In the case before us, plaintiff proved a defect in the Unitrol caused the injury for which the defendant was not liable. He submitted his case to a jury on a charge of negligence that was not proven.

Plaintiff says in his brief that in determining the sufficiency of plaintiff's evidence we must disregard defendant's evidence in conflict with plaintiff's evidence, citing Costello v. M. C. Slater, Inc., Mo. App., 220 S. W. (2d) 947. In deciding this case we have wholly disregarded any evidence of the defendant on any question of fact where it conflicted with plaintiff's evidence. We have in some instances considered defendant's evidence but only where there was no evidence introduced by plaintiff. For example, the only evidence offered on the question of whether the safety discharge valve on the regulator was functioning was introduced by the defendant. Plaintiff's witness Quebedeaux did not discover this safety device when he examined the regulator. Plaintiff's other witness Falkenrath testified the regulator operated properly after the explosion.

Plaintiff says Dr. Quebedeaux's evidence was not contrary to physical facts, [621] citing Samples v. Kansas City Rys. Co., Mo. App., 232 S. W. 1049, 1052. The trouble with many of the conclusions given by Dr. Quebedeaux is that they are not based on facts within his knowledge. Note what plaintiff says in his brief: ''We deem it important to the issues of the case to point out that Dr. Quebedeaux's uncontradicted testimony shows that *if any small amount of gas* had been seeping into the basement over the weekend, it would have been dissipated in the atmosphere long before the time of

the explosion on Monday afternoon.'' (Emphasis ours) The fact is that it was not a small amount of gas that seeped into the basement over the weekend. It was about 45 lbs. Of course, some of this gas may have dissipated into the air. The opinion of the witness was based on an assumed fact not in evidence. If only a small amount of gas seeped into the basement over the weekend, how could enough gas get into the basement in a few minutes on Monday afternoon to cause the terrific explosion? The expert witness says the faulty regulator permitted more than 12 lbs. of pressure to force this gas into the basement. To arrive at that conclusion, the witness assumed that the regulator was functioning properly at all times except the few minutes on Monday after plaintiff turned on the gas and the regulator permitted about 36 or 38 cubic feet of gas to pass into the basement in about 6 minutes. To arrive at that conclusion, the witness assumed that only a small amount of gas seeped into the basement over the weekend, which was not a fact. This witness' conclusion that all gas in the basement had dissipated before plaintiff turned on the gas on Monday was also based on this false assumption. To reach the conclusion that there was more than 12 lbs. of pressure on the line, we must also assume a fact not in evidence; that the safety discharge valve on the regulator did not function properly during those few minutes after plaintiff turned on the gas and went to the basement. When there is no evidence of an essential fact to be proved, a conclusion based thereon is mere conjecture and not an inference. Juchert v. California Water Service Co., 106 P. (2d) 886, l.c. 890 (4).

What we have said fully demonstrates, in our opinion, that plaintiff's theory of recovery as submitted to the jury was not supported by substantial evidence. Hence, the judgment must be, and is, hereby reversed. *Bohling* and *Barrett, CC.*, concur.

PER CURIAM:—The foregoing opinion by WESTHUES, C., is adopted as the opinion of the court. All the judges concur.