**Ella Rose OSTERHAUS, Appellant,**

v.

**GLADSTONE HOTEL CORPORATION,**
**Respondent.**

**No. 48058.**

Supreme Court of Missouri,

Division No. 2.

March 13, 1961.

T. J. Furry, William E. Tipton, Tipton, Birmingham & Furry, Kansas City, for appellant.

Charles F. Lamkin, Jr., George T. O'Laughlin, Kuraner, Freeman, Kuraner, Oberlander & Lamkin, Kansas City, for respondent.

BOHLING, Commissioner.

This is an action under §§ 537.080 to 537.090 by Ella Rose Osterhaus against the Gladstone Hotel Corporation for $25,000 for the alleged wrongful death of Leonard H. Osterhaus, her husband, the result of a fall out of a window at defendant's hotel. (Statutory references are to RSMo 1959, V.A.M.S., all being effective prior to the event involved.) Plaintiff appeals from an adverse judgment following defendant's motion for a directed verdict at the close of plaintiff's case.

Plaintiff, upon appeal, contends defendant furnished decedent a hotel room with a defective and dangerous window and in so doing violated the duty an innkeeper owes a paying guest: (a) Under § 315.120; Wells v. Henry W. Kuhs Realty Co., Mo., 269 S.W.2d 761, 767 [2], 47 A.L.R.2d 1038. (b) Under certain ordinances of Kansas City; Monsour v. Excelsior Tobacco Co., Mo.App., 115 S.W.2d 219, 222 [1]; Dickerson v. St. Louis Pub. Serv. Co., 365 Mo. 738, 286 S.W.2d 820, 824 [7]. And (c) under the common law; Lonnecker v. Borris, 360 Mo. 529, 229 S.W.2d 524, 526 [1], 18 A.L.R.2d 968; Cumming v. Allied Hotel Corp., Mo.App., 144 S.W.2d 177, 181.

Defendant, presenting no point with respect to a defective window or the duty of an innkeeper to a guest, contends there was no substantial evidence that any negligence of defendant was the proximate cause of the death of plaintiff's decedent.

Leonard H. Osterhaus was in the general contracting business at Seneca, Kansas. He and Harold J. Love, a brother-in-law who worked for him as a carpenter, drove to Kansas City on April 15, 1958, to make arrangements for some steel forms for the foundation of a new house. Mr. Love's testimony was to the following effect: Osterhaus was working on another job which the owner was anxious to have finished. Osterhaus was blind in his left eye and found it safer for someone else to drive. Love drove Osterhaus' automobile. They took no luggage. They arrived in Kansas City about 6:00 or 6:30 p. m., did not look for steel forms, but drove around the city looking at the buildings. They parked the car near the Gladstone Hotel about 10:00 or 10:30. They went to a nearby tavern where each had four or six 12-ounce bottles of Budweiser beer and remained until it closed. They registered at the Gladstone Hotel about 1:30. Osterhaus was shown to room 317 and Love to room 311, 30 to 40 feet down the hall on the third floor, by the porter. Love returned to Osterhaus' room. Osterhaus had taken off his coat and shoes. He had a half pint (eight ounce) bottle of whiskey. They had one or two drinks (mixes) of whiskey apiece, and sat on the bed talking. The window was closed, and neither attempted to open it. The whiskey bottle was a little over half full and Osterhaus was sitting on the bed when Love returned to room 311 about 2:15. There was nothing unusual about Osterhaus' appearance, his walking or talking at that time. It was chilly outside and Love did not raise his window. He retired and went to sleep.

Walter Williams, the porter, testified that Osterhaus and Love were laughing and joking with each other, like men who had been drinking; that there was not necessarily anything unusual about their walking, and that they were polite and not loud or boisterous.

About 4:30 or 4:45 a. m., while sitting at the front window of the lobby, the porter heard something hit a wire leading into the hotel, and then a thump on the sidewalk. He looked, saw a man lying on the sidewalk, and notified Mr. Dunnigan, the clerk, who called the police. Officer John M. Johnston of the homicide squad arrived at the Gladstone Hotel about 4:50, meeting Officers John Wilson and Harry Breshear there.

Osterhaus' dead body was on the sidewalk underneath the "17" rooms of the hotel, clothed in a shirt and trousers and without shoes or socks. An electric conduit and wires fastened to the building between the first and second floors had been pulled away from the building for about 2 feet.

The officers and the porter proceeded to room 317. The porter testified he did not unlock the door but there was testimony that he did. Osterhaus' room key is unaccounted for. Love was awakened and brought to room 317. Love appeared to be very sleepy, but otherwise was all right. The light in room 317 was burning. The bed had not been slept in, but looked like someone had laid down on it. Osterhaus'

shoes and socks were on the floor. His jacket was under and at the edge of the bed. The window was closed. The window blind, which appeared to have been torn, was on the floor by the window. The window drapes, extending from the sill to the top on each side of the window, had not been drawn together. There were two empty "7-Up" bottles and a half pint bottle of whiskey, about half full, on the table or stand in the room. Love testified that there was about a drink less in the whiskey bottle when he returned to the room.

Officer Johnston was in charge of the investigation. Officer Clare Carr was present with the laboratory car and cameras, fingerprinting equipment, et cetera. Love, the night clerk, and the porter were the only persons interviewed. Johnston noticed the top of the lower window sill but saw no footprints on it, stating he believed he would have seen them had they been there. The fingerprint powder was ·not used to determine this or whether fingerprints of any person other than Osterhaus and Love were in the room. No investigation was made of room 417. There was no evidence of criminal violence on Osterhaus' body, and they only made what is known as a "dead body" investigation. There was no post mortem or blood test for alcohol.

Osterhaus was described as being 6 feet 1 inch tall, and in good health. He was 36 years old, the father of nine children, and had no family or financial troubles.

The Gladstone Hotel has five stories. The "17" rooms of the four upper floors are not available to guests during the Summer months, as the window sashes in said rooms are then removed and suction fans installed. For the Winter months the fans are removed, the window sashes replaced, and the rooms made available to guests. Room 317 was a small room. It had a bed and a radiator, both away from the window, a dresser, chair, small table, and wash basin, but no bath. A door opened into the hall and the window, with a shade and divided drapes, opened on the front of the building. The window had no screen. The window sill was 22 inches above the floor and was roughly estimated to be 10 and also 18 to 20 inches wide. Witnesses estimated that the lower sash of the window was about 36 inches wide, 26 to 30 inches high, and when fully raised would be approximately 5 feet above the floor. This lower sash was heavier than the ordinary window in a home. The top sash was blocked so it could not be lowered.

Francis Lutz (defendant's maintenance man, testified, among other things, that he examined room 317 the day following Osterhaus' death and found .one of the lower window sash cords broken, leaving enough rope showing for one to get hold of it; that there was a piece of mop handle, just long enough to hold the window fully open, in the room; that he tested the window in several positions and it would hold for a time but would work back down, and that he had been informed about a week before that the window had a defective sash cord.

Officer Johnston and Deputy ·Coroner John A. Coyne each testified he raised the window and it would return to its closed position of its own weight. Coyne stated that one had to lean forward out of the window to look directly down.

Love testified that Osterhaus had had a lot of experience in building and remodeling and with doors and windows.

We agree with plaintiff's cited cases that our review of plaintiff's evidence is in the light most favorable to plaintiff, giving plaintiff the benefit of all legitimate inferences to be drawn therefrom (Cech v. Mallinckrodt Chemical Co., 323 Mo. 601, 20 S.W.2d 509, 511 [1, 2]); and that the necessary causal connection between negligence and injury may be established by circumstantial evidence (the Cech case, supra; Anderson v. Asphalt Distributing

Co., Mo., 55 S.W.2d 688 [7, 8], 86 A.L.R. 1033).

■ The mere fact that injury follows negligence does not necessarily create liability. Branstetter v. Gerdeman, 364 Mo. 1230, 274 S.W.2d 240, 245 [2]; Springer v. Security Nat. Bk. Sav. & Trs. Co., Mo., 175 S.W.2d 797, 800 [5–7]. A plaintiff has the burden of establishing his case, including the essential element of proximate causation. The Springer case, supra; Rose v. Thompson, 346 Mo. 395, 141 S.W.2d 824, 828 [4, 5]; Fassi v. Schuler, 349 Mo. 160, 159 S.W.2d 774, 776 [3].

■ We think it well stated by Stone, J., in Hogue v. Wurdack, Mo.App., 298 S.W.2d 492, 498 [12–14]: "Of course, a finding essential to recovery may be proved by circumstantial evidence; but, our appellate courts have said repeatedly that, in civil cases, the shown circumstances must be such that the facts necessary to support the finding may be inferred and reasonably must follow, that the existence of such facts may not depend upon guesswork, conjecture and speculation, and that the evidence should have a tendency to exclude every reasonable conclusion other than the one desired. Although an inference need not be justified beyond all doubt and is not precluded by a mere possibility that the contrary may be true * * *, the law does not countenance the drawing of forced and violent inferences which do not arise from a reasonable interpretation of the facts actually shown; and, where the evidence affords no more than equal support for either of two inconsistent and contradictory inferences as to the ultimate and determinative fact, liability is left in the field of conjecture and there is a failure of proof." See authorities cited in the Hogue case; Donnelly v. Goforth, Mo., 284 S.W.2d 462, 466 [7–10]; Thompson v. Jenkins, Mo., 330 S.W.2d 802, 804 [2]; Waldron v. Skelly Oil Co., 363 Mo. 1146, 257 S.W.2d 615, 620 [2, 3], and consult

Kirks v. Waller, Mo., 341 S.W.2d 860, 863 [2].

Of plaintiff's cases: In Cumming v. Allied Hotel Corp., Mo.App., 144 S.W.2d 177, 182 [6, 7], direct evidence established the cause of plaintiff's fall, a six-inch step down and a bathroom light fixture that was not working. The question was whether a duty was owed and not performed. In Cech v. Mallinckrodt Chemical Co., 323 Mo. 601, 20 S.W.2d 509, 511, 515 [8–10], an employee of defendant was killed in a fall down an elevator shaft which defendant concededly had failed to guard under ordinance requirements with an automatic gate that could not be opened until the elevator arrived at the floor and would close as the car left the floor. In Ward v. Ely-Walker Dry Goods Bldg. Co., 248 Mo. 348, 154 S.W. 478, 479, 484 [4–6], 45 L.R.A.,N.S., 550, stressed in the Cech case, supra, plaintiff was injured while on a sidewalk by an object falling from a building under construction at a time when defendant had failed to comply with ordinance requirements of a roof over the sidewalk for the protection of pedestrians. In Dickerson v. St. Louis Pub. Serv. Co., 365 Mo. 738, 286 S.W.2d 820, 824, defendant's bus stopped 10 to 11½ feet from the curb to discharge passengers on a busy city street and plaintiff, in the act of alighting, was injured when the bus was struck violently in the rear and knocked several feet by a truck. The issue was concurrent negligence or an efficient intervening cause. In Genova v. Kansas City, Mo.App., 254 S.W.2d 38 [6], there was evidence that an abrupt break of perhaps two inches in a concrete sidewalk caused a crack to exist in the sidewalk in the line of pedestrian travel and plaintiff's fall and injury.

Plaintiff's cited circumstantial evidence cases had evidence which established the duty and default of defendant with the inference of proximate causation reasonably following to the exclusion of other reasonable causes for the injury.

The following is illustrative of plaintiff's argument: "[I]t can *easily be assumed* that this heavy window" "would *probably* fall with a crash"; that "for Osterhaus to have gone through the window, the window had to be opened by Osterhaus"; that when his room was entered after his fall "the window was found closed, *presumably* closed behind him"; that the torn window shade was "*obviously* grabbed in desperation"; "it can *readily be inferred* that Osterhaus was *in some manner* attempting to operate the window; *presumably* to obtain ventilation *or* to use the window in *some other manner*"; "we have the *inference* that the fall of this window *in some manner* caused Osterhaus to fall"; "we know that the window would come down with a crashing weight." (Emphasis supplied.) Plaintiff also states she "can not with certainty describe the exact manner in which decedent fell" and asserts the most favorable inference from the evidence "is that the defective window in question was the instrument which caused the decedent's fatal fall." Plaintiff's presentation leaves defendant's liability to speculation and conjecture.

■ There is no showing covering Osterhaus' actions between the time Love left him at 2:15 and his fall about 4:45 a. m. The performance of the employee's duties in plaintiff's Cech case, supra, required his use of the elevator and was the cause of his intention to and his step into the open shaft. His fall would have been prevented by the required automatic gate protecting the shaft. It and other cases are distinguishable from this case in that there was no reason for Osterhaus to go through the window. If defendant's window would fall with a crash, as argued by plaintiff, the defect would tend to prevent and not to facilitate a fall out of the window. A like inference results if the window would work back under its own weight to a closed position. The window sill was 22 inches above the floor, and with the window fully raised the opening was 26 to 30 inches in height, with the lower sash about 5 feet above the floor and Osterhaus taller than the height of the opening. Under plaintiff's evidence it is as reasonable to infer that Osterhaus' fall was occasioned by his leaning too far out of the window to look down, or for some other reason, as it is to infer that his fall was the result of a defect that permitted the window to return to its closed position. Plaintiff's proof did not remove defendant's liability from the field of speculation and conjecture. Lappin v. Prebe, 345 Mo. 68, 131 S.W.2d 511, 513 [4]; Hogue v. Wurdack, Mo.App., 298 S.W.2d 492, 499 [14], and cases cited.

A case somewhat similar on the facts in which no liability was found as a matter of law is Kenney v. Washington Properties, Inc., 76 U.S.App.D.C. 43, 128 F.2d 612, 615, 146 A.L.R. 1.

We find no sufficient evidence of record of actionable negligence from the fact that the window sill was 22 inches above the floor (the Kenney case, supra, loc. cit. 613, 614), or the readily apparent absence of a screen or grille on the window for the protection of an adult (Baker v. Dallas Hotel Co., 5 Cir., 73 F.2d 825 [9]).

The judgment should be affirmed. It is so ordered.

BARRETT and STOCKARD, CC., concur.

PER CURIAM.

The foregoing opinion by BOHLING, C., is adopted as the opinion of the court.

All concur.