Allen D. McCROSKEY, Plaintiff–Respondent,

v.

BURLINGTON NORTHERN RAILROAD COMPANY, Defendant–Appellant and Third–Party Plaintiff–Appellant,

v.

166 AUTO AUCTION, INC., Third–Party Defendant–Respondent.

No. 17449.

Missouri Court of Appeals, Southern District, Division Two.

Feb. 18, 1992.

Motion for Rehearing or Transfer Denied March 12, 1992.

William A. Brasher, Daniel M. Buescher, St. Louis, Glenn A. Burkart, Mann, Walter, Burkart, Weathers & Walter, Springfield, for defendant-appellant and third-party plaintiff-appellant.

Leland L. Gannaway, Jay P. Cummings, Gannaway, Fiorella, Cummings & Bennett, Springfield, for plaintiff-respondent.

Randy R. Cowherd, Robert W. Schroff, Schroff, Glass & Newberry, Springfield, for third-party defendant-respondent.

SHRUM, Presiding Judge.

In this negligence action the defendant Burlington Northern Railroad Company (BN) appeals from a money judgment for $105,750 rendered pursuant to a jury verdict in favor of the plaintiff, Allen D. McCroskey. The jury found the plaintiff's total damages to be $117,500 and attributed 10% of the fault to him. The plaintiff broke his ankle when his foot slipped as he walked up the south ramp of BN's "ramp car" to work on the defective north ramp.

BN also appeals from the portion of the judgment which denied BN's third-party claim for full indemnity from 166 Auto Auction, Inc. (Auto Auction). The indemnity claim is based on a written contract between BN and Auto Auction.

The dispositive issue involves causation: specifically, did the plaintiff sustain his burden of producing substantial evidence from which the jury could find or reasonably infer a causal connection between the defect in the ramp car and the plaintiff's injury. Because we answer in the negative, we reverse.

## FACTS

The plaintiff, normally self-employed in the landscaping business, worked part-time in winter months for Auto Auction. He sustained a broken ankle while working for Auto Auction unloading motor vehicles from rail cars spotted at Springfield, Missouri.

Auto Auction is in the wholesale automobile business and regularly receives shipments of motor vehicles by rail through BN. Under the terms of a 1979 contract with BN's predecessor, the St. Louis–San Francisco Railway Company, Auto Auction agreed to:

determine that rail cars, bridges, and unloading ramps are in good and serviceable condition prior to the unloading or loading.... If any defects are noted by [Auto Auction] in the rail cars, bridges, or unloading ramp which, in the judgment of [Auto Auction], make it unsafe or dangerous to perform the removal from or loading on rail cars, such defects will be called to the attention of [BN which shall] immediately make necessary repairs....

[Auto Auction] agrees to indemnify and save harmless Railway from and against all loss, damage and expense in consequence of ... injury to persons ... arising out of or in connection with the duties and obligations [of Auto Auction], except where caused by the sole negligence of Railway.

The contract was in force at the time of the plaintiff's injury, and it forms the basis for BN's third-party claim against Auto Auction.

A ramp car has two parallel metal tracks or ramps which are designed to be raised or lowered by cables, powered by an electric motor, to the various tiers of multiple deck automobile rack railroad cars. The ramps are then "pinned" into place so that automobiles can be driven off the rail cars. Once the ramps are secured, cross-over ramps (also called "skids"), approximately six feet long, are placed between the ramp car and the first rail car. The motor vehicles are driven off the first rail car, over the skids, and down the ramps to the ground.

If there is more than one rail car to be unloaded, additional skids are used as bridges between successive rail cars. Once the top tiers of all rail cars are unloaded, the ramps on the ramp car are lowered to the second tier, where the process is repeated, and then to the bottom tier for unloading.

On December 27, 1983, at about 6:00 p.m., the plaintiff and two full-time employees of Auto Auction, Eddie Starkey and Larry Taylor, went to a BN siding in Springfield to unload motor vehicles from a string of not more than three rail cars lined up on tracks which ran in an east-west direction. Each rail car had three levels of

motor vehicles on it. The ramp car had been placed by BN at the west end of the string of rail cars. Starkey, the group foreman, attempted to raise the ramps to unload the cars only to find the cable on the north ramp was broken. Starkey asked Auto Auction to notify BN to fix the cable.

Informed that the ramp car had been repaired, the trio returned the next evening to find that BN had installed a new cable. Starkey and Taylor began to raise the ramps to the top tier of the rail cars. Only the south side ramp operated properly; the north side ramp, the one with the new cable, stopped three to six inches short of where it was to be pinned into place. Starkey called Auto Auction for someone to deliver a "come-along" to the site to help raise the north ramp.

When the come-along arrived, Starkey walked to the top of the south ramp to attach the come-along to the north ramp in an attempt to raise it to its proper position. Starkey called for Taylor and the plaintiff "to come up and help him." According to the plaintiff's testimony, Taylor "went up ahead of me" and then "I started up and I slipped. When I slipped my ankle popped twice that I heard...."

On cross-examination the plaintiff was asked, "[W]hatever was wrong with the north side of the car had no effect upon whatever caused you to fall, did it?" He responded, "Well, no, other than just going up to fix it." The plaintiff testified he had not slipped at any time before he reached the point where he fell, and when he reached that point, "I just kind of slid sideways a little bit and my foot caught on something." He said the south ramp was "fairly well clear," and he stated his belief that the south ramp had no defect.

The plaintiff fell, landing on the ramp; he did not fall to the ground. Starkey and Taylor helped him down and took him to a hospital. He suffered a trimalleolar fracture to his left ankle, experienced serious complications from the injury, and remains partially disabled.

The plaintiff testified that his sole reason for walking up the south ramp was to help fix the north ramp; he would not have walked up the south ramp if the north ramp had properly locked into place. He also testified that if the north ramp had worked properly, he would not have got on the ramp car at all, but instead would have climbed the ladder on the side of the rail car to reach the motor vehicles.

## DISCUSSION AND DECISION

■ BN's Point I is dispositive. In its first point, BN asserts that the trial court erred in not granting its motion for directed verdict or its motion for judgment notwithstanding the verdict because "no facts alleged or proven by [the plaintiff] showed that [BN's] alleged negligence was the proximate cause of [the plaintiff's] injuries...." The first prong of BN's argument is that the plaintiff "failed to show a physical or logical causal relation between his injuries and the alleged negligence [of BN]."

Because this point requires that we determine whether the plaintiff made a submissible case, we view the evidence in the light most favorable to the plaintiff. *Community Title v. Roosevelt Fed. S & L*, 796 S.W.2d 369, 371 (Mo. banc 1990). Our review "is not limited to isolated facts but embraces a consideration of the whole of the evidence adduced on behalf of plaintiff and conceded facts are not to be disregarded." *Duke v. Missouri Pac. R.R. Co.*, 303 S.W.2d 613, 616 (Mo.1957); *State ex rel. Missouri Highway and Transp. Comm'n v. Keeley*, 780 S.W.2d 84, 87 (Mo.App.1989). We need not disregard all evidence unfavorable to the plaintiff; we must disregard only the defendant's evidence that is unfavorable to the plaintiff. *Keeley*, 780 S.W.2d at 87. Although the defendant's evidence is rejected unless it aids the plaintiff's case, the plaintiff still bears the burden to remove his case from mere conjecture and to establish his case by substantial evidence having probative value or by reasonable inferences which can be drawn from his evidence. *Id.*

■ We also are governed by certain principles more specifically related to the

plaintiff's negligence claim. First, a railroad that delivers a rail car to a consignee whose employees are to load or unload it has a duty to exercise ordinary care to provide a reasonably safe car or to warn of any unsafe condition. *Sampson v. Missouri Pac. R.R.*, 560 S.W.2d 573, 578–79 (Mo. banc 1978); *Hedgcorth v. Missouri Pac. R.R.*, 592 S.W.2d 473, 475 (Mo.App. 1979). See also 65 Am.Jur.2d *Railroads* § 415 (1972); 75 C.J.S. *Railroads* § 924 (1952). This principle applies where, as here, the railroad furnishes equipment for the loading and unloading of its rail cars. *Cf. Willis v. Atchison, T. & S.F. Ry.*, 352 Mo. 490, 178 S.W.2d 341, 344–45 (1944) (automobile loading devices contained within a railroad freight car).

■ Second, actionable negligence requires a causal connection between the conduct of the defendant and the plaintiff's injury. As the court stated in *Bass v. Bi-State Development Agency*, 661 S.W.2d 609 (Mo.App.1983):

> A causal connection must be established between the negligence charged or submitted and the loss or injury sustained. It must be shown the injury would not have happened but for the negligence, and that the negligence was not only a cause, but was a proximate cause.

*Id.* at 613. See also 65 Am.Jur.2d *Railroads* § 415 (1972); 75 C.J.S. *Railroads* § 924 (1952).

■ Third, a plaintiff has "the burden of going forward with evidence substantial in tending to establish the constitutive or essential elements of actionable negligence...." *Donnelly v. Goforth*, 284 S.W.2d 462, 466 (Mo.1955). However, a plaintiff is not required to prove all elements of actionable negligence by direct evidence. The elements of actionable negligence "may be shown by proof of circumstances from which they may be reasonably inferred...." *Id.*

Finally, an appellate court shall not " 'imagine the existence of evidence, when none in fact exists, or supply missing evidence, to flesh out an otherwise insubmissible case, nor can it spring inferences from

nowhere upon which to predicate submissibility.' " *Cato v. Modglin*, 545 S.W.2d 307, 311 (Mo.App.1976), *quoting Wallander v. Hicks*, 526 S.W.2d 848, 850 (Mo.App.1975). And of particular note to the case before us, a causal connection cannot be left in "the nebulous twilight of speculation, conjecture and surmise." *Hildreth v. Key*, 341 S.W.2d 601, 606 (Mo.App.1960).

In his brief, the plaintiff succinctly and accurately summarizes BN's position on the causation issue as follows: "[BN] complains of a gap in Plaintiff's case, in effect stating that Plaintiff may have proved negligence and injury but failed to show a connection between the two." In response to BN's argument, the plaintiff states, "Plaintiff's position is that by virtue of [BN's] furnishing a ramp car in need of repair ... he was *placed in a hazardous position* and injured. It is an undisputed fact that Plaintiff would never have walked up the ramp of the ramp car if it had been properly operating." (Emphasis added.)

There is evidence in the record to support the conclusion that the plaintiff walked up the south ramp solely because BN did not properly repair the north ramp and that the plaintiff slipped as he went up the south ramp and broke his ankle. However, the plaintiff testified (with commendable candor) that "whatever was wrong with the north side of the car" had no connection with his injury except for the fact that he was walking up the south ramp so that he could work on the north ramp. The plaintiff's testimony concerning a lack of connection between the defective north ramp and his injury is consistent with our conclusion that he presented no evidence of a causal connection. "The mere fact that injury follows negligence does not necessarily create liability." *Osterhaus v. Gladstone Hotel Corp.*, 344 S.W.2d 91, 94 (Mo. 1961).

Plaintiff's argument that in walking up the south ramp of the ramp car he was placed in "a hazardous position" appears a frank recognition of the need for some *evidence* that he was placed in a hazardous position when he was required to walk up the south ramp and was injured as a result.

However, there is no direct evidence that the plaintiff slipped because of some hazard he encountered while he was walking up the south ramp.

"[S]lipping is a result rather than a cause. It may be produced by negligence, one's own or another's, and it may occur in the absence of any negligence at all. It is a common mischance invited by the ordinary act of walking...." *Fowler v. Terminal R.R. Ass'n*, 372 S.W.2d 497, 502 (Mo.App.1963). For any negligence of BN to be a cause of the plaintiff's injury, there must be evidence beyond the fact that his foot slipped while he was engaged in the ordinary act of walking up the south ramp.

█ A plaintiff may show the elements of actionable negligence by circumstantial evidence. *Donnelly*, 284 S.W.2d at 466. However, there is no evidence of circumstances from which the jury could have inferred that the plaintiff slipped because of a hazard while walking up the south ramp. For example, the record is devoid of evidence about the height of the south ramp once locked in place, the length of the south ramp, the degree of its incline once it was locked in place, or its width. There is no evidence that the south ramp was unstable, obstructed, unduly narrow, slick, uneven, or slanted to the north or south. Photographic exhibits reveal a ramp of the type often used to drive motor vehicles upon. It appears to be of steel construction. The surface of the ramp has numerous small holes, each with a raised rim apparently intended to provide traction to the tires of vehicles as they are loaded and unloaded.

In summary, the record is bereft of direct or circumstantial evidence that the plaintiff slipped because of some negligence on the part of BN. Indeed, the plaintiff, by his own testimony, effectively negatived a causal link between the north ramp and his injury and he negatived any inference that the south ramp was a contributing factor to his injury. *See Fowler*, 372 S.W.2d at 501. Thus the jury was required to speculate to find a causal connection between BN's alleged negligence and the plaintiff's injury.

In his response to BN's motion for a directed verdict at the close of evidence, the plaintiff's counsel argued to the court that the plaintiff "chose the safe route, which unfortunately turned out not to be too safe either, in order to go up there and repair the defect." Plaintiff's argument appears to be that, because his injury occurred in the presence of BN's alleged negligence, then he has proven the elements of actionable negligence. This argument, that liability necessarily arises where injury follows negligence, has no merit. *Osterhaus*, 344 S.W.2d at 94.

The plaintiff left the crucial element of causation in the "nebulous twilight of speculation," and, therefore, made no submissible case. The trial court erred in denying BN's motions for directed verdict and judgment notwithstanding the verdict.

Our determination that the judgment must be reversed renders all other issues moot, including BN's appeal from the portion of the judgment denying its third-party claim against Auto Auction.

We reverse.

FLANIGAN, C.J., and MONTGOMERY, J., recuse.

MAUS and PREWITT, JJ., concur.